# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

May 15, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black or dark green Nokia model TA-1400<br>cellular telephone, IMEI: 359952643817090 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.    2:24-sw-0496 CSK

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1038 | Hoaxes |
| 18 U.S.C. § 247(a)(2) | Obstruction of persons in the free exercise of religious beliefs |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice    30    days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

Special Agent Jerid Hensley, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone    *(specify reliable electronic means)*.

Date:   May 15, 2024

*Judge's signature*

City and state:   Sacramento, California            Hon. Chi Soo Kim, U.S. Magistrate Judge

*Printed name and title*

I, Jerid Hensley, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed with the FBI since December 2020. I graduated from the Basic Field Training Course at the FBI Academy in Quantico, VA in April 2021. As part of this training, I gained criminal investigation training that included course studies in criminal law and search and seizures. Upon graduation, I reported to my assigned field office in San Diego, CA. From May 2021 through September 2021, I assisted the Violent Crimes and Violent Street Gang squads with multiple search warrants involving criminal activity, to include drug trafficking and illegal gambling operations. In the process I have gained additional experience and knowledge in investigative procedures and policies covering multiple United States Code violations.  I have reviewed evidence obtained from digital devices.

3.      From May 2021 to September 2023, I was assigned to the Joint Terrorism Task Force ("JTTF") of the FBI, San Diego Division.  Since September 2023, I have been assigned to the JTTF of the FBI, Sacramento Division.  During my tenure with the JTTF, I have conducted investigations of individuals suspected of engaging in, or supporting, terrorist organizations and acts of terrorism. These counterterrorism investigations often involve the investigation of other violations of federal laws, such as immigration fraud. I have received specific training in counterterrorism investigations and the methods used by international terrorist organizations to further their unlawful goals. I have also gained knowledge of the various communications methods utilized by international terrorist organizations, including social media applications such as Facebook. From November 2016 to November 2020, I was the Senior Terrorism Intelligence Analyst and Supervisor for the California State Threat Assessment Center's Strategic Intelligence Team, where I specialized in conducting research and analysis on foreign terrorist organizations who pose a threat to U.S. interests abroad, and more specifically those who pose a

threat to the Homeland. In that capacity, I received advanced training and gained additional subject matter expertise in extremist ideologies and terrorist tactics, techniques, and procedures.

4.      Based on my training and experience, I know that many extremist groups in the Middle East, and their affiliates, and those who are indirectly inspired by these groups, utilize social media platforms and private social media messengers to include, but not limited to, X, formerly known as Twitter, direct messenger, Facebook, Facebook messenger, WhatsApp, and Discord to communicate and provide material support to these groups.

5.      I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request issuance of federal search and seizure warrants. I have participated in search warrants and arrest warrants for violations under Title 18 of the United States Code.

6.      I have seized digital devices pursuant to search warrants and have reviewed information obtained from those devices.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and therefore, does not set forth all of my knowledge about this matter.

## II.      IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.      The property to be searched is:

a.      a black or dark gray Verizon TLC model 4056SPP with FCC ID: 2ACCJN048, hereinafter "**DEVICE #1**";

b.      a black or dark green Nokia model TA-1400, IMEI: 359952643817090, hereinafter "**DEVICE #2**";

c.      **DEVICE #1** and **DEVICE #2** are collectively hereinafter referred to as the "**DEVICES**." The **DEVICES** were seized from Zimnako SALAH's ("SALAH") Toyota Prius located at a tow yard in San Diego, California, **("TOW YARD").** The FBI seized the **DEVICES** pursuant to a federal warrant discussed below.  They were shipped by the FBI to Roseville, California, and are

currently located at 2001 Freedom Way, Roseville, California.

9.      The applied-for warrant would authorize the forensic examination of the **DEVICES** for the purpose of identifying electronically stored data particularly described in Attachment B.

### III.      PROBABLE CAUSE

10.      On February 8, 2024, the **DEVICES** were seized pursuant to a sealed search warrant signed by the Honorable Steve B. Chu in the Southern District of California on February 7, 2024, case number 24mj0432-SBC. [1] The search warrant was unsealed by a court order signed by the Honorable Allison H. Goddard in the Southern District of California on April 24, 2024. On February 15, 2024, the Honorable Jeremy D. Peterson, United States Magistrate Judge in the Eastern District of California, authorized a complaint and arrest warrant for SALAH for a violation of 18 U.S.C. § 1038 (false information and hoaxes).  SALAH was transferred from state custody into federal custody in San Diego on February 16, 2024, pursuant to that complaint.  SALAH made his initial appearance on that complaint before a United States Magistrate Judge for the Southern District of California on February 20, 2024.  A redacted version of the complaint was unsealed on February 23, 2024.  At a continued detention hearing on February 23, 2024, the Magistrate Judge ordered SALAH detained.  I hereby incorporate the aforementioned unsealed search warrant as Exhibit A, and the unsealed federal complaint and supporting redacted affidavit that was signed on February 15, 2024, in the Eastern District of California as Exhibit B.  Given that SALAH has been arrested on this complaint and provided a copy of it, the government is not seeking to seal this search warrant.

11.      For the reasons stated below and in the attached exhibits, I believe there is probable cause to believe that the **DEVICES** contain evidence of alleged violations of the following:

a.   Title 18, United States Code, section 247(a)(2) provides, "(a) Whoever, in any of the circumstances referred to in subsection (b) of this section-- … (2) intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person

---

[1] On December 12, 2023, a sealed search warrant, case number 23-mj-04484 – MSB, for SALAH's Prius was signed by the Honorable Michael S. Berg in the Southern District of California. The February 7, 2024 warrant signed by Judge Chu was the second warrant authorizing the search of SALAH's Prius.  The affidavit in support of the February 7, 2024 warrant incorporated by reference the December 12, 2023 warrant and affidavit, but the attachment itself was inadvertently omitted.

in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so … shall be punished as provided in subsection (d)."  Section (b) provides, "The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce."

b.  Title 18, United States Code, section 1038(a)(1) provides, "…Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49, shall—(A) be fined under this title or imprisoned not more than 5 years, or both …"

c.  Chapter 40 of Title 18 contains 18 U.S.C. § 844(i), which states, "(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

12.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a.   Based on my training, experience, and knowledge of this investigation, I know that individuals who intend to conduct acts of mass violence in a public place will communicate their plans to other individuals, often via a digital device.  Additionally, individuals will conduct research and

4

purchase materials on digital devices in preparation for the attack.  These individuals may also conduct dry runs to ensure the success of their actual attack and evidence of these dry runs can be saved digitally. Dry runs are usually conducted by driving past or even penetrating the target, moving into sensitive areas, and observing security and law enforcement responses. The seven signs of an impending planned attack are as follows: Surveillance, Elicitation, Tests of Security, Acquiring supplies, Suspicious people who do not belong, Dry or trial runs, and Deploying assets or getting into position. Evidence of these signs can be saved digitally. Examples include saving floor plans, blueprints, or Google maps of locations to be targeted; Google searches to obtain information concerning locations to be targeted; Evidence of false or stolen identification documents to gain entry to the location to be targeted; Photographs or videos of locations to be targeted, etc. Law enforcement depends heavily on finding evidence of these activities prior to an act of violence occurring.

b.      Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.

c.      It has been my experience that individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to the individual or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

d.      Based on conversations with other law enforcement officers, I know that individuals who intend to use explosives in a public place research online or learn from other individuals how to build and detonate improvised explosive devices (IEDs).  Individuals will acquire various components, supplies, and chemicals used to build IEDs.  Many of these components can be purchased locally and online with little or no documentation from the seller.  For example, a pipe bomb can be constructed with only a pipe, explosive material, two end caps, and an ignition source.

///

///

**A.    *Location of Devices When Seized***

13.    Pursuant to the aforementioned warrant, agents seized the **DEVICES** from SALAH's Toyota Prius located at the **TOW YARD**.

14.    The FBI investigation has revealed that SALAH has been found to have multiple devices on his person. During the traffic stop by Texas State Troopers on November 25, 2023, discussed in Exhibit A, they reported that SALAH had four devices in his possession. During the traffic stop and subsequent arrest by the San Diego Police Department on November 28, 2023, also discussed in Exhibit A, it was reported that SALAH had two devices in his possession.[2]  A subsequent FBI search of SALAH's Toyota Prius on December 13, 2023, revealed an additional two devices found in the vehicle.[3] During both law enforcement encounters, SALAH discussed how he was using a cellular telephone that he stated was his mother's cellular telephone.[4] For all of these reasons, I believe that SALAH had access to and control of all of the **DEVICES** in the Toyota Prius.

15.    Agents executing the search warrant found the following **DEVICES** in the following locations:

a)    **SALAH's DEVICE #1** in the Toyota Prius within the center console; and

b)    **SALAH's DEVICE #2** in the Toyota Prius within an external pouch on travel luggage sitting in the passenger front seat.

16.    The **DEVICES** are currently in storage at 2001 Freedom Way, Roseville, California. In my training and experience, I know that the **DEVICES** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **DEVICES** first came into the possession of the FBI.

---

[2] On February 15, 2024, the Honorable Jeremy D. Peterson authorized the complaint attached hereto as Exhibit B. SALAH was transferred to federal custody on February 16, 2024.

[3] The two devices found on SALAH's person and the two devices found in the Toyota Prius are likely the same four devices that were found during the traffic stop in Texas when SALAH was driving the Toyota Land Cruiser. Of note is the fact that SALAH appeared to have then moved all four devices from the Toyota Land Cruiser and into the Toyota Prius when he traveled to El Cajon, California.

[4] As discussed in the complaint affidavit and the original unsealed seizure warrant, SALAH provided conflicting information to the Texas State Troopers and TFO Padilla of the San Diego Harbor Police concerning which phone, either a black/dark gray iPhone or a white and pink iPhone was his mother's.

## IV.     <u>TECHNICAL TERMS</u>

17.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store

any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses

f.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature

1   hard drives.  This removable storage media can store any digital data.  Most PDAs run

2   computer software, giving them many of the same capabilities as personal computers.  For

3   example, PDA users can work with word-processing documents, spreadsheets, and

4   presentations.  PDAs may also include global positioning system ("GPS") technology for

5   determining the location of the device.

6   g.   Internet: The Internet is a global network of computers and other electronic devices that

7       communicate with each other.  Due to the structure of the Internet, connections between

8       devices on the Internet often cross state and international borders, even when the devices

9       communicating with each other are in the same state.

10   18.   Based on my training, experience, and research, I know that **SALAH's DEVICES** have

11   the capabilities that allow them to serve as a wireless telephone, digital camera, portable media player,

12   GPS navigation device, and PDA. In my training and experience, examining data stored on devices of

13   this type can uncover, among other things, evidence that reveals or suggests who possessed or used the

14   device.[5]

15   ## V.   ELECTRONIC STORAGE AND FORENSIC ANALYSIS

16   19.   Based on my knowledge, training, and experience, I know that electronic devices can

17   store information for long periods of time. Similarly, things that have been viewed via the Internet are

18   typically stored for some period of time on the device.  This information can sometimes be recovered

19   with forensics tools.

20   20.   As further described in Attachment B, this application seeks permission to locate not only

21   electronically stored information that might serve as direct evidence of the crimes described on the

22   warrant, but also forensic evidence that establishes how the **DEVICES** were used, the purpose of their

23   use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence

24   might be on the **DEVICES** because:

25   / / /

26

27   [5] Based on open-source research of the DEVICES, the Nokia model TA-1400 does not have GPS navigation capabilities, but the Verizon TLC model 4056SPP can have its GPS location enabled by a user.

28

9

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21.   Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **DEVICES** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

22.   Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

# VI.    CONCLUSION

23.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **DEVICES** described in attachment A-1 to A-2 to seek items described in Attachment B.

/s/
_____

Special Agent Jerid Hensley
Federal Bureau of Investigation

Affidavit submitted by email/pdf and attested to me as true and accurate by telephone consistent with Fed.R.Crim.P 4.1 and 41(d)(3) this _15_ day of May 2024

_____
HONORABLE CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF CALIFORNIA

//
//
//

Approved as to form by:

_/s/ Angela L. Scott_____
ANGELA SCOTT
Assistant United States Attorney

**<u>ATTACHMENT A-1</u>**

**PROPERTY TO BE SEARCHED**

The property to be searched is a black or dark gray Verizon TLC model 4056SPP cellular telephone with FCC ID: 2ACCJN048, which is currently located at 2001 Freedom Way, Roseville, California.

This warrant authorizes the forensic examination of this device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-2**

**PROPERTY TO BE SEARCH**

The property to be searched is a black or dark green Nokia model TA-1400 cellular telephone, IMEI: 359952643817090, which is currently located at 2001 Freedom Way, Roseville, California.

This warrant authorizes the forensic examination of this device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

## **PARTICULAR ITEMS TO BE SEIZED**

1.   The following evidence to be searched for and seized pertains to violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes):

    a.   Communications, records, information, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

        i.   involving or indicating threats to commit acts of violence, including bomb threats and hoax bomb threats;

        ii.   involving acts of violence;

        iii.   pertaining to possessing or manufacturing explosives, bombs or bomb-making equipment or supplies, including butane, gasoline or any other flammable substance;

        iv.   pertaining to the possession of firearms;

        v.   pertaining to churches in Roseville, California; La Mesa, California; Greenwood Village, Colorado; Scottsdale, Arizona; or any other churches as yet unknown;

        vi.   pertaining to the possession of the following articles of clothing or accessories:  a black backpack, a light blue polo shirt with a darker-colored collar, a grey or black hat, a red hat, and a black "puffy" jacket;

        vii.   pertaining to any license plate;

        viii.   indicating any motive to threaten or harm individuals affiliated with any religion;

        ix.   pertaining to any storage facility or unit;

        x.   tending to identify other facilities, storage devices, or services (such as email addresses, IP addresses, phone numbers) that may contain electronic evidence concerning acts of violence or threats to commit acts of violence, including bomb threats and hoax bomb threats;

        xi.   tending to identify co-conspirators, criminal associates, or others involved in efforts to commit, or to threaten to commit, acts of violence, including bomb threats and hoax bomb threats;

      xii.   tending to identify travel to or presence at locations involving acts of violence or threats to commit acts of violence, including bomb threats and hoax bomb threats and/or tending to identify or exclude travel to or presence at locations described by Zimnako SALAH in post-arrest statements;

      xiii.   all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls potentially utilized by SALAH;

      xiv.   tending to identify the user of, or persons with control over or access to, the subject phones, including logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

      xv.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above; or

      xvi.   tending to establish whether communications were deleted, to include date and time of deletion;

  b.   Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses that pertain to any of the following:

      i.   threats to commit acts of violence, including bomb threats and hoax bomb threats;

      ii.   acts of violence;

      iii.   explosives, bombs or bomb-making equipment or supplies, including butane, gasoline or any other flammable substance;

      iv.   churches in Roseville, California; La Mesa, California; Greenwood Village, Colorado; Scottsdale, Arizona; or any other churches as yet unknown;

      v.   indicating any motive to threaten or harm individuals affiliated with any religion;

      vi.   pertaining to any storage facility or unit;

2.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.  This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# EXHIBIT A

# UNITED STATES DISTRICT COURT

for the

**SEALED**     Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No. **24mj0432-SBC**
)
2008 green/yellow Toyota Prius )
(VIN: JTDKB20UX83422305) )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 247(a)(2) | Obstruction of persons in the free exercise of religious beliefs |
| 18 USC § 1038 | Hoaxes |

The application is based on these facts:

See Attached Affidavit of FBI Special Agent Jerid Hensley, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jerid Hensley, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 02/07/2024 _____

_____
*Judge's signature*

City and state: San Diego, California      Hon. Steve B. Chu, U.S. Magistrate Judge
*Printed name and title*

I, Jerid Hensley, a Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## I.  INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the premises known as a 2008 green/yellow Toyota Prius (**SUBJECT VEHICLE**) as further described in Attachment A for evidence and instrumentalities of violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes), which items are more specifically described in Attachment B. Attachment A and Attachment B are attached hereto and incorporated by reference.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed with the FBI since December 2020. I graduated from the Basic Field Training Course at the FBI Academy in Quantico, VA in April 2021. As part of this training, I gained criminal investigation training that included course studies in criminal law and search and seizures. Upon graduation, I reported to my assigned field office in San Diego, CA. From May 2021 through September 2021, I assisted the Violent Crimes and Violent Street Gang squads with multiple search warrants involving criminal activity, to include drug trafficking and illegal gambling operations. In the process I have gained additional experience and knowledge in investigative procedures and policies covering multiple United States Code violations.  I have reviewed evidence obtained from digital devices.

3.     From May 2021 to September 2023, I was assigned to the Joint Terrorism Task Force ("JTTF") of the FBI, San Diego Division.  Since September 2023, I have been assigned to the JTTF of the FBI, Sacramento Division.  During my tenure with the JTTF, I have conducted investigations of individuals suspected of engaging in, or supporting, terrorist organizations and acts of terrorism. These counterterrorism investigations often involve the investigation of other violations of federal laws, such as immigration fraud. I have received specific training in counterterrorism investigations and the methods used by international terrorist organizations to further their unlawful goals. I have also gained knowledge of the various communications methods utilized by international terrorist organizations,

including social media applications such as Facebook. From November 2016 to November 2020, I was the Senior Terrorism Intelligence Analyst and Supervisor for the California State Threat Assessment Center's Strategic Intelligence Team, where I specialized in conducting research and analysis on foreign terrorist organizations who pose a threat to U.S. interests abroad, and more specifically those who pose a threat to the Homeland. In that capacity, I received advanced training and gained additional subject matter expertise in extremist ideologies and terrorist tactics, techniques, and procedures.

4. Based on my training and experience, I know that many extremist groups in the Middle East, and their affiliates, and those who are indirectly inspired by these groups, utilize social media platforms and private social media messengers to include, but not limited to, Twitter direct messenger, Facebook, Facebook messenger, WhatsApp, and Discord to communicate and provide material support to these groups.

5. I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request issuance of federal search and seizure warrants. I have participated in search warrants and arrest warrants for violations under Title 18 of the United States Code.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and therefore, does not set forth all of my knowledge about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes) have been committed and that evidence and instrumentalities of these crimes, as further described in Attachment B, which is incorporated here by reference, will be located in the **SUBJECT VEHICLE** as described in Attachment A, which is also incorporated here by reference.

2

## II.   IDENTIFICATION OF THE DEVICES TO BE SEIZED

8.      As set forth in detail in Attachment B, this application seeks a warrant to search the **SUBJECT VEHICLE** for and seize from the **SUBJECT VEHICLE** the following two devices and various evidence contained thereon:

a.      a black or dark gray Verizon TLC model 4056SPP with FCC ID: 2ACCJN048, hereinafter "**DEVICE #1**";

b.      a black or dark green Nokia model TA-1400, IMEI: 359952643817090, hereinafter "**DEVICE #2**";

c.      **DEVICE #1** and **DEVICE #2** are collectively hereinafter referred to as the "**DEVICES**."

## III.      LEGAL BACKGROUND

9.      This investigation concerns alleged violations of the following:

a. Title 18, United States Code, section 247(a)(2) provides, "(a) Whoever, in any of the circumstances referred to in subsection (b) of this section-- … (2) intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so … shall be punished as provided in subsection (d)."  Section (b) provides, "The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce."

b. Title 18, United States Code, section 1038(a)(1) provides, "…Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49, shall—(A) be fined under this title or imprisoned not more than 5 years, or both …"

c. Chapter 40 of Title 18 contains 18 U.S.C. § 844(i), which states, "(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

## IV.    PROBABLE CAUSE

### A.    Execution of Prior Search Warrant

1.    On December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search Zimnako SALAH's 2008 Toyota Prius ("Prius") and to affix a tracker as part of an ongoing investigation involving the aforementioned federal criminal statutes. This search warrant, application and affidavit is attached hereto as Exhibit A and hereby incorporated as though fully set forth herein.[1]

---

[1] On November 28, 2023, SALAH was pulled over in his Prius by San Diego Police near the intersection of Broadway and Ballantyne in El Cajon, CA for having a stolen license plate on the vehicle. Upon a search of the vehicle for additional stolen items, officers discovered a handgun (make and model CZ P-10, serial number G033124) under the driver's side floor mat. A loaded magazine with 15 hollow point rounds was also located right next to the pistol. A record check showed the handgun registered to a person named ███████████ of Glendale, Arizona. SALAH was subsequently arrested for possession of a loaded gun, 25850 (C)(6) - PC - Carry loaded handgun: not registered owner, and 25850 (A) - PC - Carry loaded firearm on person/vehicle: public place. The Prius was impounded and taken to Road One Towing, located at 4334 Sheridan Ln., San Diego, CA 92129 where it currently remains. As noted below, the Prius is currently in San Diego Harbor Police Department custody at the tow yard.

On December 1, 2023, a judge ruled that SALAH was not eligible for bail. On December 14, 2023, SALAH appeared in court for a preliminary hearing. After the hearing, the judge determined SALAH to be a danger to the public if released and kept all charges as originally charged. No jury trial was scheduled at the time of the preliminary hearing, but the District Attorney's Office was ordered to file additional forms to correct a filing error, and SALAH was ordered back in court on December 28,

2.      On December 13, 2023, FBI San Diego and a Task Force Officer from the San Diego Harbor Police Department transported the Prius from Road One Towing, located at 4334 Sheridan Ln., San Diego, CA 92129, to the FBI San Diego office, where it was subsequently searched and a tracker was affixed. The following items were seized and/or observed (this is not a complete list):

- **DEVICES**
- Ball bearings and loose screws, bolts, and nails.
- Stevinson Toyota East, Aurora, Colorado documents dated November 17, 2023.
- A black hat.
- A black Nike hat.
- A Hawke & Co black puffy jacket.
- A black backpack.
- A document containing a ██████ billing history for cube A26 located in Denver, Colorado on East Warren Avenue.
- Hardy brand black gloves.
- A Dickies black jacket with an attached gray hood.

3.      The Prius was subsequently returned to the vehicle tow yard the same day where it remains. The FBI left the requisite notice of this warrant in the Prius. As mentioned above, in addition to a few other personal belongings observed and items seized, the **DEVICES** were located inside the Prius during the search but were not seized.

**B.      Federal Search Warrants Served on SALAH's Phoenix, Arizona Residence, Land Cruiser, and Kawasaki Motorcycle**

4.      On December 11, 2023, the Honorable John Z. Boyle, United States Magistrate Judge, District of Arizona, authorized warrants for the FBI to search SALAH's residence located at 3839 W. Cactus Wren Dr., Phoenix, Arizona 85051; the 1999 Gold Toyota Land Cruiser; and the 2020 Kawasaki motorcycle.

---

2023. During SALAH's December 28, 2023 court appearance, readiness was scheduled for January 1, 2024 and his jury trial was scheduled for February 15, 2024.

5.     On December 12, 2023, FBI Phoenix and your affiant served the search warrants and seized and/or observed the following items inside the residence and/or the vehicles (this is not a complete list):

- A 2020 Kawasaki motorcycle bearing Arizona license plate KAA80M found inside the residence living room.
- A black motorcycle helmet and black/red riding gloves from inside the motorcycle's rear storage compartment.
- A black backpack full of clothing items near the motorcycle.
- A bag of destroyed license plates that were cut into pieces.
- A folder containing multiple license plates not attached to vehicles.
- A bag containing a black hat that was cut into pieces.
- Wiring connected to a large battery and two unknown electrical devices.
- Multiple cellphones.
- A digital camera.
- A GPS device.
- A loaded pistol.
- Two additional motorcycles.
- A 1999 Gold Toyota Land Cruiser.
- ███████████████████████████████████
  ███████████████████
- Sermon notes from ██████ Church dated October 22, 2023.

6.     The motorcycle observed in SALAH's living room bearing Arizona license plate KAA80M appears to be the same motorcycle depicted in the law enforcement database photo referenced in Exhibit A from the morning of September 24, 2023. The motorcycle and the helmet and gloves worn by the individual that placed a black backpack inside the Scottsdale church on September 24, 2023 resemble the motorcycle, helmet, and gloves found inside SALAH's residence and the motorcycle's rear storage compartment.

7.    Based on the discovery of the destroyed license plates and a black hat that was cut into pieces inside SALAH's residence and Land Cruiser, all of which were listed on Attachment B of the search warrants, your affiant assesses that SALAH was attempting to hide/destroy evidence involving his hoax activities at the Christian churches. In addition, the black hat that was cut up also appeared to have a short bill that resembled the same black hat worn in the Roseville, California church incident.

8.    FBI agents reviewed the aforementioned sermon notes that were found within the residence and determined that they appeared to be from ███ Church, ███████ La Mesa, California 91941, based on the name of the pastor that was associated with the notes. Based on this information, I contacted TFO Padilla and asked that FBI San Diego make an inquiry with ███ Church in La Mesa, California to determine if they had any recent suspicious incidents. Here is a photograph of the sermon notes taken during the search of SALAH's residence:



9.    TFO Padilla contacted your affiant on January 5, 2024, after interviewing a security

7

1   guard at ▮▮▮▮▮ Church. The security staff reported that they remembered a suspicious individual

2   matching SALAH's description on October 22, 2023, the same date as the sermon notes. The security

3   guard stated that the individual was carrying a backpack and left with the backpack in a Prius with

4   Arizona license plates.  The security member then provided the following screenshots taken from video

5   surveillance footage at the church:[2]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   [2] The church security guard stated that the church no longer has the video of the church
surveillance footage, but because it was suspicious when this subject was there, they took screenshots

27   and saved them.

28



11:05:55 AM PDT ● LIVE



Add a Caption

Sunday • Oct 22, 2023 • 2:15 PM    Adjust
IMG_9398

Screenshot    PNG

No lens information
0.3 MP · 542 × 569 · 2.5 MB

1      10.    Law enforcement database information places SALAH's Toyota Prius with an Arizona

2 license plate (DSA8PD) in El Cajon, California on October 19, 2023 at approximately 3:17 PM PDT.

3 The next instance that law enforcement database information places SALAH's Toyota Prius with an

4 Arizona license plate is in Phoenix, Arizona on October 22, 2023 at approximately 7:26 PM PDT.[3] The

5 timestamp on the October 22, 2023 screenshot from the church is 11:05 AM PDT and that is sensible as

6 Sunday church times at ▓▓▓▓ church are 8:00AM, 9:30AM, and 11:15AM.[4],[5]  According to Google

7 Maps, the travel time between ▓▓▓▓ Church in La Mesa, California and Phoenix, Arizona is

8 approximately five and one half to six hours. This travel time is within the timeframe of 11:15 AM  PDT

9 to 7:26:50 PM PDT.

10      11.    Based on previous review of video surveillance footage of SALAH as well SALAH's

11 previously documented activities at the Roseville, California church, the Greenwood Village, Colorado

12 church, and the Scottsdale, Arizona church, I believe the individual at ▓▓▓▓ Church in La Mesa,

13 California on October 22, 2023 was SALAH. As he did in the Roseville, California church incident and

14 the Greenwood Village, Colorado church incident, SALAH immediately returned to Phoenix, Arizona

15 after visiting the church. An additional note of concern is that it appears SALAH was located within the

16 children's building associated with ▓▓▓▓ church. It is my understanding that the children's building is

17 separate and apart from the main church building.[6]

18      12.    This represents the fourth Christian church that the FBI has identified wherein SALAH

19 participated in a hoax or hoax-like suspicious activities. Based on FBI interviews and a review of

20 SALAH's Apple iPhone 7 Plus, SALAH is currently a practicing Muslim.

21

22

23     [3] At this time your affiant is not aware of any other dates or times that SALAH's Toyota Prius

24 with an Arizona license plate was identified in law enforcement databases from October 19, 2023 to
October 22, 2023.

25     [4] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

26     [5] The timestamp on the photo showing 2:15 PM was from the church staff/volunteer who took
the photo on their personal cellphone of the surveillance video screen.

27     [6] The FBI investigation of SALAH has not revealed that SALAH has children.

28         10

**C. Searches of SALAH's Digital Devices to Date**

13. On December 1, 2023, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, authorized search warrants (23mj4360-KSC and 23mj4361-KSC) for two cell phones seized from SALAH upon his arrest on the state charges referenced in Exhibit A.

14. Additionally, pursuant to the above-referenced search warrant issued in the District of Arizona, the FBI seized three cell phones from SALAH's residence.

15. To date, the FBI has been able to access three of these devices and has found the following relevant information:

a. Location data for SALAH leading up to his arrest. The location data shows SALAH's last visits to Dallas, TX and El Cajon, CA in November 2023.

b. The following cached images which concern weapons, military, the current conflict in Israel, ISIS, Christianity and/or Judaism:

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





2Ejpg_embedded_1.jpg

12



13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





**» Images**

Details      Events (0)

Save

| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F40g7oT3rNpk%2Fframe0%2Ejpg_embedded_1.jpg |
| Type: | Images |
| Size (bytes): | 28054 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651C89/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F40g7oT3rNpk%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F40g7oT3rNpk%2Fframe0%2Ejpg_embedded_1.jpg |

**» Images**

Details      Events (0)

Save

| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F65zb_Yea-gM%2Foar2%2Ejpg_embedded_1.jpg |
| Type: | Images |
| Size (bytes): | 42510 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651C89/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F65zb_Yea-gM%2Foar2%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F65zb_Yea-gM%2Foar2%2Ejpg_embedded_1.jpg |

14

## » Images

Details  Events (0)

Save

| | |
|---|---|
| **Name:** | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F6SMwcvX7nW0%2Fframe0%2Ejpg_embedded_1.jpg |
| **Type:** | Images |
| **Size (bytes):** | 20215 |
| **Path:** | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F6SMwcvX7nW0%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2F6SMwcvX7nW0%2Fframe0%2Ejpg_embedded_1.jpg |



15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





**» Images**

Details | Events (0)

Save

Name: https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%
2F6-X8obam_QQ%2Fframe0%
2Ejpg_embedded_1.jpg

Type: Images

Size (bytes): 18770

Path: f0d6daf6296ee7664c549126cf8e289cb73ef876_f
iles_full.zip/private/var/mobile/Containers/Data/
Application/0CD70485-8E43-4EFB-9778-97388E
651CB9/Library/Caches/
com.pinterest.PINDiskCache.com.youtube.innert
ube.imageservice.cache/https%3A%2F%2Fi%
2Eytimg%2Ecom%2Fvi%2F6-X8obam_QQ%
2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%
2Ecom%2Fvi%2F6-X8obam_QQ%2Fframe0%
2Ejpg_embedded_1.jpg

16



17





**» Images**

Details     Events (0)

Save

| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Feh80g5Qcwj8%2Fframe0%2Ejpg_embedded_1.jpg |
|---|---|
| Type: | Images |
| Size (bytes): | 22184 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Feh80g5Qcwj8%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Feh80g5Qcwj8%2Fframe0%2Ejpg_embedded_1.jpg |

**» Images**

Details     Events (0)

Save

| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FEqKlh54iN20%2Fframe0%2Ejpg_embedded_1.jpg |
|---|---|
| Type: | Images |
| Size (bytes): | 12056 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FEqKlh54iN20%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FEqKlh54iN20%2Fframe0%2Ejpg_embedded_1.jpg |

19



**» Images**

Details | Events (0)

YOU CAN'T BEAT A NATION THAT NEVER GIVES UP! ~

Save

Name: https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi% 2FFf5KUk_hjJc%2Fframe0% 2Ejpg_embedded_1.jpg

Type: Images

Size (bytes): 25619

Path: f0d6daf6296ee7664c549126cf8e289cb73ef876_f iles_full.zip/private/var/mobile/Containers/Data/ Application/0CD70485-8E43-4EFB-9778-97388E 651CB9/Library/Caches/ com.pinterest.PINDiskCache.com.youtube.innert ube.imageservice.cache/https%3A%2F%2Fi% 2Eytimg%2Ecom%2Fvi%2FFf5KUk_hjJc% 2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg% 2Ecom%2Fvi%2FFf5KUk_hjJc%2Fframe0% 2Ejpg_embedded_1.jpg

**» Images**

Details | Events (0)

The burial of over a hundred unknown Palestinian bodies today morning.

Save

Name: https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi% 2FgP6-DBKljhU%2Fframe0% 2Ejpg_embedded_1.jpg

Type: Images

Size (bytes): 32623

Path: f0d6daf6296ee7664c549126cf8e289cb73ef876_f iles_full.zip/private/var/mobile/Containers/Data/ Application/0CD70485-8E43-4EFB-9778-97388E 651CB9/Library/Caches/ com.pinterest.PINDiskCache.com.youtube.innert ube.imageservice.cache/https%3A%2F%2Fi% 2Eytimg%2Ecom%2Fvi%2FgP6-DBKljhU% 2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg% 2Ecom%2Fvi%2FgP6-DBKljhU%2Fframe0% 2Ejpg_embedded_1.jpg

20

» **Images**

Details          Events (0)



Save

| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi% 2FHWFo1rreDGs%2Fframe0% 2Ejpg_embedded_1.jpg |
| Type: | Images |
| Size (bytes): | 15510 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_f iles_full.zip/private/var/mobile/Containers/Data/ Application/0CD70485-8E43-4EFB-9778-97388E 651CB9/Library/Caches/ com.pinterest.PINDiskCache.com.youtube.innert ube.imageservice.cache/https%3A%2F%2Fi% 2Eytimg%2Ecom%2Fvi%2FHWFo1rreDGs% 2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg% 2Ecom%2Fvi%2FHWFo1rreDGs%2Fframe0% 2Ejpg_embedded_1.jpg |



21



**Name:** https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FjZtVw_c52gl%2Fframe0%2Ejpg_embedded_1.jpg

**Type:** Images

**Size (bytes):** 20542

**Path:** f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FjZtVw_c52gl%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FjZtVw_c52gl%2Fframe0%2Ejpg_embedded_1.jpg

23



**Name:** https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgltQ%2Fframe0%2Ejpg_embedded_1.jpg

**Type:** Images

**Size (bytes):** 12897

**Path:** f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgltQ%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgltQ%2Fframe0%2Ejpg_embedded_1.jpg

24



## » Images

| Details | Events (0) |

Save

| | |
|---|---|
| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi% 2FIXJdgDjw1Ks%2Fframe0% 2Ejpg_embedded_1.jpg |
| Type: | Images |
| Size (bytes): | 39205 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_f iles_full.zip/private/var/mobile/Containers/Data/ Application/0CD70485-8E43-4EFB-9778-97388E 651CB9/Library/Caches/ com.pinterest.PINDiskCache.com.youtube.innert ube.imageservice.cache/https%3A%2F%2Fi% 2Eytimg%2Ecom%2Fvi%2FIXJdgDjw1Ks% 2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg% 2Ecom%2Fvi%2FIXJdgDjw1Ks%2Fframe0% 2Ejpg_embedded_1.jpg |

25

## » Images

Go to +

| Details | Events (0) |
|---------|-----------|



Save

Name: https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%
2FndKrlZshX_0%2Fframe0%
2Ejpg_embedded_1.jpg

Type: Images

Size (bytes): 46872

Path: f0d6daf6296ee7664c549126cf8e289cb73ef876_f
iles_full.zip/private/var/mobile/Containers/Data/
Application/0CD70485-8E43-4EFB-9778-97388E
651CB9/Library/Caches/
com.pinterest.PINDiskCache.com.youtube.innert
ube.imageservice.cache/https%3A%2F%2Fi%
2Eytimg%2Ecom%2Fvi%2FndKrlZshX_0%
2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%
2Ecom%2Fvi%2FndKrlZshX_0%2Fframe0%
2Ejpg_embedded_1.jpg

26

## » Images

| Details | Events (0) |
|---|---|



Save

Name: https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FN298nz5t838%2Fframe0%2Ejpg_embedded_1.jpg

Type: Images

Size (bytes): 33242

Path: f0d6daf6296ee7664c549126cf8e289cb73ef876_f iles_full.zip/private/var/mobile/Containers/Data/ Application/0CD70485-8E43-4EFB-9778-97388E 651CB9/Library/Caches/ com.pinterest.PINDiskCache.com.youtube.innert ube.imageservice.cache/https%3A%2F%2Fi% 2Eytimg%2Ecom%2Fvi%2FN298nz5t838% 2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg% 2Ecom%2Fvi%2FN298nz5t838%2Fframe0% 2Ejpg_embedded_1.jpg

27



## » Images

### Details    Events (0)

Save

| | |
|---|---|
| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Fq5IS9tFfWTA%2Fframe0%2Ejpg_embedded_1.jpg |
| Type: | Images |
| Size (bytes): | 25676 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Fq5IS9tFfWTA%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Fq5IS9tFfWTA%2Fframe0%2Ejpg_embedded_1.jpg |

28

## » Images

Details    Events (0)





Save

| | |
|---|---|
| **Name:** | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FwfjK2FIBPOc%2Fframe0%2Ejpg_embedded_1.jpg |
| **Type:** | Images |
| **Size (bytes):** | 28357 |
| **Path:** | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FwfjK2FIBPOc%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FwfjK2FIBPOc%2Fframe0%2Ejpg_embedded_1.jpg |

29





» Images

Details     Events (0)

Save

| Name: | https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FzL4UEkRD8L0%2Fframe0%2Ejpg_embedded_1.jpg |
|---|---|
| Type: | Images |
| Size (bytes): | 16058 |
| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FzL4UEkRD8L0%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FzL4UEkRD8L0%2Fframe0%2Ejpg_embedded_1.jpg |

31

1
2

**» Images**                                          Go to

3

| Details | Events (0) |
| --- | --- |

4

5
6
7
8
9
10
11
12
13
14

Save

15

| Name: | https%3A%2F%2Flh3%2Egoogleusercontent%2Ecom%2F44HDrGXVjVwdVZHuUaVQwY75iN3hZhjX1siUCPwnVqxHv9rNzuI8pDBjw_OHc5eCunxs8R1ahRw1YuKX8Q_embedded_1.jpg |
| --- | --- |

16
17
18

| Type: | Images |
| --- | --- |
| Size (bytes): | 61345 |

19

| Path: | f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Flh3%2Egoogleusercontent%2Ecom%2F44HDrGXVjVwdVZHuUaVQwY75iN3hZhjX1siUCPwnVqxHv9rNzuI8pDBjw_OHc5eCunxs8R1ahRw1YuKX8Q/https%3A%2F%2Flh3% |

20
21
22
23
24
25
26
27
28

32

1
2

## » Images

| | |
|---|---|
| Details | Events/... |

Save

**Name:** https%3A%2F%2Fyt3%2Eggpht%2Ecom%
2F4cUTFWkxIWi8mOUgHnFiumluzXwssEUnkYY
VVDZoqnl2Yd9mur0ppJ_GAKa9A_wIP8UcX9jc=s
88-c-k-c0x00ffffff-no-rj_embedded_1.jpg

**Type:** Images

**Size (bytes):** 3148

**Path:** f0d6daf6296ee7664c549126cf8e289cb73ef876_f
iles_full.zip/private/var/mobile/Containers/Data/
Application/0CD70485-8E43-4EFB-9778-97388E
651CB9/Library/Caches/
com.pinterest.PINDiskCache.com.youtube.innert
ube.imageservice.cache/https%3A%2F%2Fyt3%
2Eggpht%2Ecom%
2F4cUTFWkxIWi8mOUgHnFiumluzXwssEUnkYY
VVDZoqnl2Yd9mur0ppJ_GAKa9A_wIP8UcX9jc=s
88-c-k-c0x00ffffff-no-rj/https%3A%2F%2Fyt3%
2Eggpht%2Ecom%
2F4cUTFWkxIWi8mOUgHnFiumluzXwssEUnkYY
VVDZoqnl2Yd9mur0ppJ_GAKa9A_wIP8UcX9jc=s
88-c-k-c0x00ffffff-no-rj_embedded_1.jpg

33

16. The review of the data obtained from these cellular telephones is ongoing.

**D. Information Obtained Showing SALAH is Renting a Storage Unit in Colorado**

17. As mentioned above, on December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search SALAH's Prius and to affix a tracker. You affiant was not present for the search.

18. Your affiant observed a photograph from the search of the Prius which showed a ▮▮▮▮ billing history bearing the title "ZIMNAKO SALAH SALAH […] Cube A26". The name and address of the company that issued the statement was ▮▮▮▮, address ▮▮▮▮▮ Denver, CO 80247. The billing history included a report for November 15, 2023, showing that SALAH paid $340.29 cash on October 7, 2023 for Unit A26, which is a 12x30x8 foot unit.

19. On December 14, 2023, your affiant called ▮▮▮▮▮ and spoke to E.H., the manager of the facility. During the interview, E.H. provided the following information:

a. E.H. is the manager of ▮▮▮▮▮ located at the aforementioned work address. He is aware of Zimnako SALAH as a current customer who is renting cube A26, a 12x30 foot storage unit. SALAH has a past due balance on his storage unit. If the past due amount is outstanding for 31 days, a lien will be placed on the storage unit; after 67 days the contents of the storage unit will be offered for sale by ▮▮▮▮.

b. On November 18, 2023, E.H. personally came in contact with SALAH at the storage facility. E.H. stated that there were several red flags with SALAH, such as SALAH breaking the storage facility policies. There were two specific incidents that caused E.H. concern. E.H. did not want to go into specific details about the policy issues, but SALAH was about to be evicted from the business. One problem was that SALAH appeared to stay overnight in his personal vehicle at the storage facility, which was not allowed.

c. E.H. has observed SALAH driving a Toyota Prius that appeared to be gray/silver, but he was not completely sure about the color. SALAH started renting the storage unit on October 7, 2023. The license plate on the Prius appeared to be from Arizona. E.H. observed a portion of the license

34

plate number, which appeared to start with DSA.[7]

d. E.H. has personal cellphone video of SALAH that he took on November 18, 2023, after there was an incident with Salah breaking policy at the storage facility. Aside from the Prius, SALAH was also seen on the business's surveillance cameras on a different date driving what appeared to be a Subaru Wagon or a Toyota Highlander with a hitch on the back towing a motorcycle. E.H. was not certain about the make and model of the vehicle, but he knew it was SALAH based on the surveillance footage. E.H. personally witnessed SALAH's Prius inside the storage unit on November 18, 2023, which is one day prior to the suspicious incident that occurred at the ████ ████████ Church located in Greenwood Village, Colorado, as discussed previously.

20.   Your affiant conducted an open source search to find the approximate distance between the storage unit and ██████████████ Church. It is approximately 5.6 miles between both locations, according to the open source information pictured below.



18 min (5.6 mi) via CO-30 W and S Yosemite St

Directions

21.   Based on a review of law enforcement database information, your affiant is not aware of

---

[7] As mentioned above, SALAH's Prius is registered with Arizona license plate DSA8PD.

35

any information indicating that SALAH has maintained employment and/or a residence in Colorado. The FBI also does not have any information to suggest that SALAH has close family members who reside in Colorado, nor does he appear to have strong ties to Colorado.[8] Based on the facts involving the storage unit, your affiant assesses that the storage unit may have be used by SALAH as a staging and/or storage location for items involving his suspicious activities at █████████ Church on November 19, 2023, as well as the previous hoax incidents at churches in Roseville, California on November 12, 2023, and Scottsdale, Arizona on September 24, 2023.

**E.** **Federal Search Warrant Served on SALAH's Storage Unit**

22. On December 27, 2023, the Honorable S. Kato Crews, United States Magistrate Judge, District of Colorado, authorized a warrant for the FBI to search the premises known as █████████ ████, Cube A26, located at █████████., Denver, Colorado 80247 as part of an ongoing investigation involving the aforementioned federal criminal statutes.

23. On December 28, 2023, FBI agents executed the search of the storage unit. Your affiant was not present for the search. Agents seized a red hat and a black hat during this search.

24. On December 28, 2023, your affiant reviewed the search photos taken during the search of the storage unit and observed the following items (this is not a complete list):

- Red and white electrical wires modified with electrical tape and nails affixed to a battery.

- A black neoprene case with what appear to be electrical wires attached to it or near to it.

- Wire cutters lying on the floor next to the modified electrical wires.

- A strip of silver/gray duct tape with nails affixed to the adhesive side of the tape lying on top of a blanket.

- A receipt from a store lying next to the aforementioned duct tape with nails affixed.

---

[8] During his interview on November 21, 2023, SALAH told FBI agents that he went to Colorado on November 15, 2023 to look for work. He stated that he worked for an individual named Abu Aya who was renting a warehouse. SALAH said he worked for Abu Aya for two days but never received payment. SALAH said he left the warehouse because Abu Aya was cheating customers. The FBI has been unable to corroborate this information. SALAH also denied ever going to a church in Colorado and when he was shown a photograph of himself at the church, he agreed that it was him and asked if it was illegal to go to churches.

- A second strip of duct tape with nails affixed to the adhesive side of the tape, lying on the floor next to the bed matt, with lose nails and at least one visible ball bearing surrounding it.

- A Coleman propane canister next to what appears to be an Islamic Koran near the head of the bed matt. The propane canister had strips of what appear to be the same silver/gray duct tape stuck to the canister, along with a white electrical wire protruding from the neck of the propane canister with electrical tape around the wire and port.

- Two additional propane canisters without electrical wires or tape affixed.

- A box of ignition coils lying on the floor next to the propane canisters.

- Kurdish Arabic words spray painted in large, black lettering on the wall of the storage unit.

- A plastic bag next to a packaged battery and an empty battery package on the floor.

- Plastic bags with what appear to be items inside of them lying on the floor.

25.     Based on your affiant's training and experience, I identified many of the aforementioned items in the photographs as evidence pertaining to hoax bombs and bombs, namely containers containing flammable substances, possible explosives, possible bombs, and bomb-making equipment or supplies.

26.     On December 28, 2023, your affiant confirmed that a Special Agent Bomb Technician (SABT) was not present during the execution of the search warrant.

27.     On December 28, 2023, your affiant contacted an FBI Sacramento SABT David Doh,[9] who also reviewed the search photos. The SABT stated that the propane canister with the white electrical wire protruding near the port of the canister appeared to be modified, and that only SABTs should handle the canister.[10] The red and white electrical wire with the nails affixed to a battery

---

[9] In 2021, SABT Doh attended the 240-hour FBI certified course on Hazardous Devices Basic Course in which he learned about explosives, explosives components, electric components, hazardous device designs and theories, fuses, and detonators, chemical components, use for weapons of mass destruction, destructive devices, and chemical weapons. He also learned how destructive devices are designed, built and designed to function. He also learned how to identify the components of destructive devices after an explosion and learned basic post blast investigations.  SABT Doh has participated in at least 12 different destructive device investigations that involved actual devices since he was certified in 2021.

[10] Agents executing the search initially assessed that the propane canisters were used to warm the

appeared to be configured to conduct an electric current that could potentially be used as part of an explosive device and/or a hoax device. The silver/gray duct tape with nails affixed to the adhesive could be used as shrapnel on an explosive device and/or a hoax device. The SABT also noted that it was concerning that the nails appeared to be new. The SABT conducted an open-source search of the ignition coils, which showed that the coils are designed to produce the high voltage necessary to ignite an air/fuel mixture in a combustion chamber. Based on the description, the SABT assessed that there is the potential for the ignition coils to be modified and used in an explosive device. The SABT stated that based on the photographs and his training and experience, the combined parts in the photos appeared to be modified in order to potentially make an explosive device and/or a hoax device. The SABT stated that any future FBI search should include SABTs in order to further assess the materials/devices, and to ensure the safety of the storage facility and the search scene.

28. On December 29, 2023, a certified FBI Kurdish Arabic linguist translated the spray-painted black Kurdish Arabic writing on the wall of the storage unit. The FBI linguist stated the following: "The two words on top of each other on the right side says: Asshole [or: Fucking, or: Stupid] Jew[.] The two words on top of each other on the left side says: Allah… Muhammad[.]" The photos below include those observed by your affiant, which were taken by the search team photographer (these are not all of the photographs):

unit.

38













42





1

2

3        **F.        Second Federal Search Warrant Served on SALAH's Storage Unit**

4        29.       On January 17, 2024, the Honorable Scott T. Varholak, United States Magistrate Judge,

5   District of Colorado, authorized a warrant for the FBI to conduct a second search of the premises known

6   as ▮▮▮▮▮▮▮▮▮▮▮ Cube A26, located at ▮▮▮▮▮▮▮▮▮ Denver, Colorado 80247 as

7   part of an ongoing investigation involving the aforementioned federal criminal statutes.

8        30.       On January 17, 2024, FBI agents executed the search of the storage unit. Your affiant was

9   present for the search, along with an FBI SABT. The following items were seized:

10   • Duct tape with nails affixed.

11   • Duct tape.

12   • A used paper towel and tape.

13   • Red and white wires attached to a battery.

14   • A larger duct tape strip with nails affixed and a 9-volt battery.

15   • Nails, ball bearings, and nuts and bolts.

16   • A Battery and micro-USB cable.

17   • A box of seven Duralast ignition coils.

18   • Wire cutters.

19   • A Coleman propane tank with silver/gray duct tape stuck to the canister, along with a white

20      electrical wire protruding from the neck of the propane canister with black electrical tape around

21      the wire and port.

22   • A second Coleman propane tank.

23   • A yellow propane tank.

24        31.       SABTs x-rayed the Coleman propane tank with the white electrical wire mentioned

25   above at the search scene. SABT Doh assessed that the white electrical wire did not appear to go inside

26   the tank, but it was wrapped around the neck of the canister near the port and taped down with electrical

27   tape. There did not appear to be any foreign substance inside the tank other than propane. SABT Doh

28

44

assessed that the electrical wire was likely not capable of igniting the propane tank with an electrical current based on the position of the wire. SABT Doh assessed that the material in the storage unit mentioned above was likely being used for a hoax bomb device or possibly being used to attempt to make a viable explosive device. FBI Sacramento is sending the materials to the FBI Terrorist Explosive Device Analytic Center for further analysis.

### G. Additional Probable Cause to Believe that Evidence of the Aforementioned Offenses will be on the DEVICES

#### 1. Training and Experience Regarding Individuals who Conduct Acts of Mass Violence

32. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

a. Based on my training, experience, and knowledge of this investigation, I know that individuals who intend to conduct acts of mass violence in a public place will communicate their plans to other individuals, often via a digital device. Additionally, individuals will conduct research and purchase materials on digital devices in preparation for the attack. These individuals may also conduct dry runs to ensure the success of their actual attack and evidence of these dry runs can be saved digitally. Dry runs are usually conducted by driving past or even penetrating the target, moving into sensitive areas, and observing security and law enforcement responses. The seven signs of an impending planned attack are as follows: Surveillance, Elicitation, Tests of Security, Acquiring supplies, Suspicious people who do not belong, Dry or trial runs, and Deploying assets or getting into position. Evidence of these signs can be saved digitally. Examples include saving floor plans, blueprints, or Google maps of locations to be targeted; Google searches to obtain information concerning locations to be targeted; Evidence of false or stolen identification documents to gain entry to the location to be targeted; Photographs or videos of locations to be targeted, etc. Law enforcement depends heavily on finding evidence of these activities prior to an act of violence occurring.

b. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.

45

c. It has been my experience that individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to the individual or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

d. Based on conversations with other law enforcement officers, I know that individuals who intend to use explosives in a public place research online or learn from other individuals how to build and detonate improvised explosive devices (IEDs). Individuals will acquire various components, supplies, and chemicals used to build IEDs. Many of these components can be purchased locally and online with little or no documentation from the seller. For example, a pipe bomb can be constructed with only a pipe, explosive material, two end caps, and an ignition source.

### H. Current location of the DEVICES

33. The **DEVICES** are currently located within SALAH's Toyota Prius that is impounded at Road One Towing, located at 4334 Sheridan Ln., San Diego, CA 92129 and in the custody of the San Diego Harbor Police Department. In my training and experience, I know that the **DEVICES** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **DEVICES** were observed inside the Prius during the execution of the search warrant of the Prius mentioned above.

### V. PROBABLE CAUSE REGARDING ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. I submit that there is probable cause to believe records will be stored on computers or storage media on the **DEVICES** for reasons delineated above. Based on my knowledge, training, and experience, and conversations with other Special Agents involved in forensic examinations of digital devices, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be

46

recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

35. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

36. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

37. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

38. Based on inspection of other evidence related to this investigation, as described above, I am aware that SALAH possesses multiple cellular phones. Consequently, there is reason to believe that there is a computer system (here, cell phones) currently located in/at/on the **SUBJECT VEHICLE**.

## A. <u>Forensic Evidence</u>

39. There is probable cause to believe that this forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when will be on any storage medium in/at/on the **SUBJECT VEHICLE** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.

47

Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

c.   Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation

48

information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Furthermore, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

d.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

e.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

f.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

**B.**     **Definitions**

40.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital

data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

41. Based on my training, experience, and research, I know that the **DEVICES** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

42. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

51

**C.**     **Necessity of Seizing or Copying Entire DEVICES**

43.     In lieu of removing electronic devices from the **SUBJECT VEHICLE**, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the electronic devices data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic device, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because forensic electronic evidence is relevant here, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

## VI.     CONCLUSION

44.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, evidence and instrumentalities of these offenses, more fully described in Attachment B of this affidavit, are located in the **SUBJECT VEHICLE**, namely on the **DEVICES**. I respectfully request that this Court issue a search warrant to search the **SUBJECT VEHICLE** for the items set forth in Attachment B.

## VII.     REQUEST FOR SEALING

45.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation involving victims that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. I request that the executing agents or

1  officers be permitted to provide a copy of the search warrant as required by Federal Rule of Criminal

2  Procedure 41(f) and that the U.S. Attorney's Office may provide a copy of the search warrant and

3  affidavit to the defense attorney in discovery, without further order of this Court, if federal criminal

4  charges arise out of this investigation. If state criminal charges arise, the U.S. Attorney's Office

5  requests the ability to provide a copy of the search warrant documents to the Deputy District Attorney

6  prosecuting the case, without a further court order.

7

8

9                                                    Special Agent Jerid Hensley
                                                     Federal Bureau of Investigation
10

11  Affidavit submitted by email/pdf and
    attested to me as true and accurate by
12  telephone consistent with Fed.R.Crim.P 4.1 and
    41(d)(3) this  7th     day of February 2024
13

14  _____
    HON. STEVE B. CHU
15  UNITED STATES MAGISTRATE JUDGE
    SOUTHERN DISTRICT OF CALIFORNIA
16

17  Approved as to form by:

18  *Carling Donovan*
    _____
19  CARLING DONOVAN
    Assistant United States Attorney
20

21

22

23

24

25

26

27

28                                     53

**<u>ATTACHMENT A</u>**

**PROPERTY TO BE SEARCHED**

A 2008 green/yellow Toyota Prius (VIN: JTDKB20UX83422305) including any locked containers within the vehicle and any hidden compartments located within the vehicle.



## ATTACHMENT B

## PARTICULAR ITEMS TO BE SEIZED

1.   The following evidence to be searched for and seized pertains to violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes):

   a.   A cellular telephone (**DEVICE #1**), specifically a black or dark gray Verizon TLC model 4056SPP with FCC ID: 2ACCJN048

   b.   A cellular telephone (**DEVICE #2**), specifically a black or dark green Nokia model TA-1400 with IMEI: 359952643817090

2

Case 3:24-mj-00432-SBC *SEALED* Document 2 (Court only) Filed 02/07/24 PageID.57
Page 1 of 4
Case 2:24-sw-00496-CSK Document 1 Filed 05/15/24 Page 75 of 170

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**SEALED**

for the

Southern District of California

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| 2008 green/yellow Toyota Prius (VIN: JTDKB20UX83422305) | ) |

Case No. **24mj0432-SBC**

# NOT FOR PUBLIC VIEW

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Southern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____February 21, 2024_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Steve B. Chu_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   February 7, 2024

City and state:   San Diego, California

*Judge's signature*

Hon. Steve B. Chu, U.S. Magistrate Judge
*Printed name and title*

Case 3:24-mj-00432-SBC *SEALED* Document 2 (Court only) Filed 02/07/24 PageID.58
Page 2 of 4
Case 2:24-sw-00496-CSK Document 1 Filed 05/15/24 Page 76 of 170

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>**24mj0432-SBC** | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

---

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>ATTACHMENT A</u>

## PROPERTY TO BE SEARCHED

A 2008 green/yellow Toyota Prius (VIN: JTDKB20UX83422305) including any locked containers within the vehicle and any hidden compartments located within the vehicle.



1

Case 3:24-mj-00432-SBC *SEALED* Document 2 (Court only) Filed 02/07/24 PageID.60
Page 4 of 4
Case 2:24-sw-00496-CSK Document 1 Filed 05/15/24 Page 78 of 170

## ATTACHMENT B

### PARTICULAR ITEMS TO BE SEIZED

1. The following evidence to be searched for and seized pertains to violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes):

      a.   A cellular telephone (**DEVICE #1**), specifically a black or dark gray Verizon TLC model 4056SPP with FCC ID: 2ACCJN048

      b.   A cellular telephone (**DEVICE #2**), specifically a black or dark green Nokia model TA-1400 with IMEI: 359952643817090

2



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DISCLOSURE OF A SEARCH WARRANT AUTHORIZING THE SEARCH OF A 2008 GREEN/YELLOW TOYOTA PRIUS (VIN: JTDKB20UX83422305) | Misc. No. 24mj0432-SBC<br><br>ORDER AUTHORIZING UNSEALING OF REDACTED WARRANT |

For the reasons set forth in the United States' *ex parte* motion, and good cause appearing therefor, the Court grants the motion unsealing the redacted warrant 24mj0432-SBC attached to the United States' *ex parte* motion at Exhibit A.  The unredacted warrant and related documents shall remain under seal until further order of the Court.

IT IS SO ORDERED.

Dated:  April 24, 2024

HON. ALLISON H. GODDARD
United States Magistrate Judge

# EXHIBIT B

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

<table>
<tr><td>United States of America<br>v.<br><br>ZIMNAKO SALAH<br><br><br><hr>Defendant(s)</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.   2:24-mj-0020 JDP</td></tr>
</table>

**FILED**

Feb 15, 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

## REDACTED CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____November 12, 2023_____ in the county of _____Placer_____ in the _____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1038(a)(1)(A) | False Information and Hoaxes |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____/s/ Jerid Hensley_____
*Complainant's signature*

Special Agent Jerid Hensley,
Federal Bureau of Investigation
*Printed name and title*

Sworn to me and signed via telephone.

Date: ____February 15, 2024____

*Judge's signature*

City and state:  ____Sacramento, California____

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

PHILLIP A. TALBERT
United States Attorney
ANGELA L. SCOTT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. |
|---|---|
| Plaintiff, | AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT |
| v. | **UNDER SEAL** |
| ZIMNAKO SALAH, | |
| Defendant. | |

I, Jerid Hensley, being first duly sworn, hereby depose and state as follows:

## I.       INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since December 2020.  I graduated from the Basic Field Training Course at the FBI Academy in Quantico, VA in April 2021.  As part of this training, I gained criminal investigation training that included course studies in criminal law and search and seizures.  Upon graduation, I reported to my assigned field office in San Diego, CA.  From May 2021 through September 2021, I assisted the Violent Crimes and Violent Street Gang squads with multiple search warrants involving criminal activity, to include drug trafficking and illegal gambling operations. In the process I have gained additional experience and knowledge in investigative procedures

AFFIDAVIT

and policies covering multiple United States Code violations.  I have reviewed evidence obtained from digital devices.

2.      From May 2021 to September 2023, I was assigned to the Joint Terrorism Task Force ("JTTF") of the FBI, San Diego Division.  Since September 2023, I have been assigned to the JTTF of the FBI, Sacramento Division.  During my tenure with the JTTF, I have conducted investigations of individuals suspected of engaging in, or supporting, terrorist organizations and acts of terrorism.  These counterterrorism investigations often involve the investigation of other violations of federal laws, such as immigration fraud.  I have received specific training in counterterrorism investigations and the methods used by international terrorist organizations to further their unlawful goals.  I have also gained knowledge of the various communications methods utilized by international terrorist organizations, including social media applications such as Facebook.  From November 2016 to November 2020, I was the Senior Terrorism Intelligence Analyst and Supervisor for the California State Threat Assessment Center's Strategic Intelligence Team, where I specialized in conducting research and analysis on foreign terrorist organizations who pose a threat to U.S. interests abroad, and more specifically those who pose a threat to the Homeland.  In that capacity, I received advanced training and gained additional subject matter expertise in extremist ideologies and terrorist tactics, techniques, and procedures.

3.      Based on my training and experience, I know that many extremist groups in the Middle East, and their affiliates, and those who are indirectly inspired by these groups, utilize social media platforms and private social media messengers to include, but not limited to, X, formerly known as Twitter, direct messenger, Facebook, Facebook messenger, WhatsApp, and Discord to communicate and provide material support to these groups.

4.      I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request issuance of federal search and seizure warrants.  I have participated in search warrants and arrest warrants for violations under Title 18 of the United States Code.

AFFIDAVIT

## II.   **LEGAL BACKGROUND**

5.     This investigation concerns alleged violations of the following:

a.  Title 18, United States Code, section 1038(a)(1) provides, "…Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49, shall—(A) be fined under this title or imprisoned not more than 5 years, or both …"

b.  Chapter 40 of Title 18 contains 18 U.S.C. § 844(i), which states, "(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both; and if personal injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be imprisoned for not less than 7 years and not more than 40 years, fined under this title, or both; and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

## III.   **PURPOSE OF THE AFFIDAVIT**

6.     This affidavit is submitted in support of a request that a complaint and arrest warrant be issued for ZIMNAKO SALAH ("SALAH") for a violation of 18 U.S.C. § 1038 (false

AFFIDAVIT

information and hoaxes).

7.     This affidavit is intended to show that there is sufficient probable cause for the requested complaint.  It does not purport to set forth all of my knowledge of the investigation in this matter.  Facts not set forth herein are not relied upon in reaching my conclusion that a warrant should be issued.

## IV.     PROBABLE CAUSE

### A.     *BASIS FOR FACTS SET FORTH IN THIS AFFIDAVIT*

8.     I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation. Conclusions I have reached are based on my training, experience, and upon information I believe to be reliable from the following sources:

a.     Oral and written reports to include analysis about this investigation as well as related local investigations, which I have received from other law enforcement agencies;

b.     Review of online account information;

c.     Subject interviews;

d.     Witness interviews;

e.     Law enforcement and public databases and records;

f.     Review of security camera footage;

g.     Review of subject's cellular telephone; and

h.     Review of items observed/seized.

9.     Unless otherwise noted, when I assert that a statement was made, I have personal knowledge of the information or I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report.  The officer had personal knowledge of the information or received it from another law enforcement officer or a witness with personal knowledge of the information.

**B.**   _BRIEF OVERVIEW OF EVIDENCE_

10.     There is probable cause to believe that on Sunday, November 12, 2023, SALAH committed a bomb hoax at a church located in the Eastern District of California.  SALAH is an Arizona resident.  Between September 24, 2023, and his arrest in San Diego County on November 28, 2023, SALAH visited at least four churches, one in Arizona, two in California, and one in Colorado.  During each of the trips, SALAH visited only briefly and did not attend church services.  Each time, SALAH carried a backpack.  At two of the four churches, he placed a backpack in the church and immediately left.  Specifically, at the Arizona church, he left the backpack in the sanctuary.  In one of the California churches—the church located in the Eastern District of California—he tied the backpack to the toilet in the men's restroom.  Church employees at both churches treated the backpacks as potentially containing a bomb.  As a result of the Eastern District of California bomb hoax, the church has increased security and incurred substantial additional security costs.

11.     During his travels around the western United States, SALAH frequently changed license plates on his vehicle in what appears to be an attempt to avoid detection by law enforcement.  On November 25 and again on November 28, SALAH was arrested with a loaded firearm under the driver's seat of his vehicle.  Additionally, prior to visiting the Colorado church, SALAH rented a storage unit located approximately fifteen minutes from that church.  SALAH stayed overnight in the unit and stored component parts for a destructive device or a hoax device, such as a propane cannister with wires taped to it, and strips of duct tape lined with nails.  As pictured and discussed in detail below, an antisemitic statement was scrawled on the wall of the storage unit in Kurdish along with a reference to the Prophet Muhammad.

**C.**   _SALAH TRAVELS FROM ARIZONA AND TIES A BACKPACK TO A TOILET IN A ROSEVILLE, CALIFORNIA CHURCH_

12.     Based on information from a law enforcement database, a green/yellow 2008 Toyota Prius ("Prius") registered to ZIMNAKO SALAH ("SALAH") was in the parking lot of a Christian church located in Roseville, California at approximately 8:32 a.m. on Saturday,

November 11, 2023.  According to the law enforcement database, the Prius began to back out of a stall at the church parking lot at approximately 8:49 a.m.

13.     Law enforcement databases also indicate that the Prius traveled in Roseville, California and neighboring Rocklin, California at several times between the hours of 2:23 a.m. and 11:15 a.m. on November 11, 2023.

14.     Based on my review of local police department reports, security camera footage from the aforementioned Christian church located in Roseville, California, and information provided by members of the church and church staff, I know that on Sunday, November 12, 2023, at approximately 9:40 a.m., an individual later identified as SALAH approached a side entrance of the church, poked his head through the door, and then entered the church from that side entrance with a backpack.  Once inside, he looked behind himself and then walked directly to the men's bathroom.  He was in the bathroom for approximately 35-40 seconds and exited the bathroom without the backpack.  He immediately left the church through the same side entrance. At one point as he was leaving the church, he jogged.  SALAH arrived during the 9:00 a.m. service, so there were no witnesses to his activity in the lobby.  He was, however, captured on the church's security footage.  He was wearing a hat while in the church.  The church did not have security cameras in its parking lot, so no additional footage was captured of SALAH in the church parking lot.  The local police department obtained footage at a nearby intersection of the Prius with an Arizona license plate registered to SALAH at approximately 9:36 a.m., 9:45 a.m., 9:48 a.m., and 9:49 a.m. on November 12, 2023, which is immediately before and shortly after the incident at the church in Roseville.

15.     According to church members and church staff, when church staff became aware of the backpack, they photographed it and called the local police department.  Police officers arrived at approximately 1:20 p.m.  In the interim, a church staff member removed the backpack, opened it, and located a pillow inside.

16.     The photograph that the church staff took is below.  As the photograph depicts, it was tied to the toilet.

AFFIDAVIT



17.    Still images from the church security footage are below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24        18.    Based on my review of a driver's license photo and passport application
25  containing SALAH's photo, the person in the photos above appears to be SALAH.

26        19.    A police officer familiar with SALAH's appearance and actions on Sunday,
27  November 12, 2023, returned to the church to view additional footage on November 27, 2023.

28

Upon his review, he noted that SALAH had also entered and left the church on November 12, 2023, prior to placing the backpack in the bathroom.  Specifically, the officer observed:

   a.  SALAH entered the church at 09:23:44 PST on the opposite side of where he later entered, same clothes but no backpack.

   b.  SALAH entered the sanctuary at 09:23:53 PST.

   c.  SALAH exited the sanctuary on the opposite side at 09:26:04 PST.

   d.  SALAH walked straight to the same bathroom in which he later left the backpack, and he entered that bathroom at 09:26:15 PST.

   e.  SALAH exited the bathroom at 09:27:31 PST.

   f.  SALAH exited the church at 09:27:51 PST using the same exit he used after he planted the backpack, and walked away from the church in the same direction.

   20.     Below are screenshots from the abovementioned footage:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





AFFIDAVIT

AFFIDAVIT









21.     Based on my training, experience and knowledge of this investigation, I believe that SALAH tied the backpack to the toilet in the church on Sunday, November 12, 2023, in an attempt to indicate that a bomb had been left in the restroom.  I believe that the presence of SALAH's Prius in the church parking lot on November 11, 2023 (the morning before he left the backpack) and SALAH's presence in the church at 9:23 a.m. (less than 20 minutes before he left the backpack) indicates that SALAH was surveilling the church in an effort to facilitate his placement of the backpack in the church.

22.     Upon receiving this information, the FBI reviewed a law enforcement database that indicated that the Prius was in Phoenix, Arizona, on October 30, 2023, in Lakeside, California, on November 1, 2023, in Carlsbad, California, on November 5, in Sacramento, California, from November 5 to November 9, in the Bay Area (Hercules, Pinole, and Sausalito) from November 9 to November 10, and in Roseville and Rocklin, California, from November 11 to November 12.

23.     As noted above, information obtained from a law enforcement database showed that the Prius was in Roseville, California, shortly before and after SALAH was at the Roseville church.  This database information also showed that the Prius was in Phoenix, Arizona the next day, November 13, 2023.

24.     On January 24, 2024, your affiant interviewed an employee of the Roseville church ("Church Employee 1"). During the interview, Church Employee 1 provided the following information:

    a. Church Employee 1 has been employed at the church for nine years and in Christian ministry for 20 years. The November 12, 2023 incident where someone left a suspicious backpack tied to a men's restroom toilet at the church's Roseville campus was the strangest security incident he has witnessed.

    b. On November 12, 2023, while coming out of the 9:00 AM church service at the Roseville church, Church Employee 1 made his way from backstage to the church's front lobby, when church security notified him of a suspicious backpack in a men's restroom. Church

1  Employee 1 stated that the church's security team is mostly made up of active and/or

2  retired law enforcement officers.

3  c.  Once Church Employee 1 and church security who were involved saw that the backpack

4      was tied/strapped to the pipes of the toilet in the men's stall, they determined that they

5      needed to call 911. One individual called 911, and another individual (Church Volunteer)

6      began creating a barrier/perimeter around the restroom, which required her to move high

7      school church congregants who had an area near the restroom where they normally

8      gathered. Church Employee 1 stated that he felt "tight in the chest" recalling the incident.

9  d.  They began to evacuate special needs students out of a classroom located next to the

10     men's restroom with the suspicious backpack. Other church greeters were placed at

11     entrances/exits to block doors and redirect church foot traffic. Security began to move

12     mobile six-foot by five-foot wood walls with wheels to help create a barrier/perimeter

13     around the restroom and to direct the flow of foot traffic. Church Employee 1 and

14     security began to tell people in the vicinity of the men's restroom asking questions that

15     there was a security issue.

16 e.  There had been a large youth campout at the church building the previous day, so Church

17     Employee 1 and some of the security staff had initially thought maybe one of the kids at

18     the campout left a backpack in the restroom. Church Employee 1 then went back out to

19     the restroom area and found that a fairly large perimeter had been established around the

20     restroom. However, Church Employee 1 and the security staff agreed it was not just a bag

21     left in the restroom by a youth member the day before, and that it was actually strapped to

22     the toilet pipes, which was very suspicious and concerning.

23 f.  At that point, another church employee in a separate building across from one of the main

24     church doors, which was the closest door to the men's restroom with the suspicious

25     backpack, began preparing staff and children to be evacuated from the children's

26     building. They still had not heard from the local police department or seen them respond

27     after originally calling 911 upon the discovery of the suspicious backpack. They called

28

AFFIDAVIT

911 again to ask if they should evacuate the church and surrounding church buildings. The 911 dispatcher told them that they were dealing with multiple calls, and that the church's call would be handled in the order it was received.

g.  Church Employee 1 stated that he then made the ill-advised decision to attempt to figure out what was in the suspicious backpack. Church Employee 1 and Church Volunteer found a first aid person, gathered in the church food preparation area, said a prayer, put gloves on, and Church Volunteer took the lead and they slowly made their way to the restroom and the suspicious backpack. Church Volunteer unstrapped the backpack from the toilet pipes and moved it outside and away from the main church building. Church Volunteer discovered a pillow inside of the backpack. Church Volunteer took the pillow and backpack and placed them in a church dumpster. They called 911 a third time and explained that a pillow had been found inside the backpack and that the situation was mitigated.

h.  After the security camera footage was viewed by Church Employee 1 and other church staff/security members, it became clear that the individual who left the backpack in the church restroom was not known to attend the church. Church Employee 1 stated that it was "chilling" to watch security camera footage of the suspicious individual. Church Employee 1 later heard that a similar incident had happened at a different church, which made Church Employee 1 think that the Roseville church was targeted by the individual who left the backpack.

i.  Church Employee 1 recalled that when he first heard about the suspicious backpack, he thought it could have been left in the restroom by one of the youth members who participated in the campout the day before. However, when they saw that the backpack was tied/strapped to the toilet, Church Employee 1 thought there was possibly a bomb in the backpack. Church Employee 1 stated that the backpack was left at the most strategic time, between two services, when there is the most foot traffic at the church.

j.  Church Employee 1 stated that he and Church Volunteer were scared to deal with the backpack and said a prayer before going into the restroom.

k.  The special needs classroom next to the restroom with the suspicious backpack was closed just before the second church service started due to the incident. Church staff/security had to turn families away who went to drop off their special needs children at the classroom, likely forcing parents to also miss their adult service in the main sanctuary.

l.  The perimeter around the restroom was pushed out into the main church lobby, forcing normal foot traffic to shift, and also forced the church to close its cafe in/near the lobby, which is where they sell coffee, snacks, and other items. The cafe remained close throughout the entire second church service.

25.    On January 24, 2024, your affiant interviewed a member of the security team for the Roseville church, hereinafter referred to as "Church Volunteer" During the interview, Church Volunteer  provided the following information:

a.  During a church service at the Roseville church on November 12, 2023, Church Volunteer  heard a call over the church security radio that something was found in the men's restroom. Church Employee  told Church Volunteer  that a church member told him about the backpack found in the men's restroom stall. Church Volunteer witnessed the backpack herself, and it was strapped to the toilet. She began creating a safety perimeter around the restroom. Church Employee 1 had just taken bomb training as part of his employment with Sacramento County, so Church Volunteer felt comfortable with his help.

b.  They started making a larger perimeter while they waited for the local police department to respond to the church.

c.  Church Volunteer recalled praying, putting gloves on, and going to the restroom with Church Employee 1 to inspect the backpack. Church Volunteer recalled thinking she

"might meet Jesus today" before handling the backpack. Church Volunteer took the backpack outside, where she carefully opened it and saw a pillow inside.

d. Church Volunteer 's first concern when seeing the backpack was that it was an explosive device, and based on her training and experience, she began to think about other secondary devices. Church Volunteer was especially concerned about the children in the church.

e. Church security had to move/displace high school congregants who typically gather in the area near the restroom.

f. The church's cafe had to shut down because the safety perimeter pushed into the main lobby, which disturbed the movements of hundreds of congregants.

g. Church Volunteer stated that she made a mistake handling the suspicious backpack. The backpack was tied to the toilet in a way that was intended to look like a bomb, based on her training and experience. Church Volunteer is a retired Sheriff's Deputy who was on duty from 1999-2014. Church Volunteer recalled throwing the backpack away in the dumpster because she was told that the local police department was not coming to the church.

h. Church Volunteer stated that the subject who left the backpack seemed to have been on the campus before based on his movements, and that he planned to leave the backpack during a time when people were in service so he might go unnoticed. The subject's movements looked very intentional, based on Church Volunteer 's review of the security camera footage. The incident personally impacted Church Volunteer, and she is more aware that the church could be a target. Church Volunteer realized that there are people out there who might want to hurt their people. The entire incident has forced the church to change their protocols, and it has shook up church staff and volunteers.

26.   On January 24, 2024, your affiant interviewed another employee of the Roseville church, hereinafter referred to as "Church Employee 2" During the interview, Church Employee 2 provided the following information:

AFFIDAVIT

a. On November 12, 2023, during the middle of 9:00 a.m. service, it was relayed over radio communication utilized by the security team, and other leaders from the church that a backpack was left in the men's restroom. That particular weekend, the church hosted a campout for middle-school-aged children. This led staff to initially think one of the children accidently left a backpack behind. It was further discovered and relayed to church security that the backpack was tied to a toilet. Security and staff personnel no longer believed it was left by one of the youth who attended the campout.

b. Church security began to block off the front entrance to the restroom utilizing a wooden partition on wheels. As time went on, security decided to establish a larger perimeter away from the restroom. They moved the partition back to door two, located near the main entrance, which is door three. This made door two the main point of entry into the church. Door five, the closest door to the men's restroom with the suspicious backpack was also blocked off.

c. Once Church Employee 2 watched the security camera footage, she became much more concerned. Church Employee 2 stated that she thought the incident could have been a dry run or test run by the individual who left the backpack.

27.     On January 24, 2024, your affiant interviewed a Roseville church employee familiar with the church's finances ("Church Employee 3"). Church Employee 3 explained how the church significantly modified and increased its security measures following the incident with the backpack on November 12, 2023. Church Employee 3 also noted that the church spent thousands of dollars on this additional security.

**D.**     ***SALAH*** *TRAVELS DIRECTLY FROM* ***PHOENIX, ARIZONA*** *TO A CHURCH IN THE* ***DENVER, COLORADO*** *AREA WHERE HE AGAIN BRINGS A BACKPACK BUT IS ENCOUNTERED BY SECURITY*

28.     On November 17, 2023, the FBI received information from a law enforcement database indicating that the Prius was in Highlands Ranch, Colorado on November 15, 2023.[1]

---

[1] Law enforcement database information provided by FBI Dallas on December 13, 2023 indicated that SALAH's Toyota Prius having license plate DSA8PD was in Thornton, Colorado on November 18, 2023.

AFFIDAVIT

On November 20, 2023, an agent from the FBI Sacramento office contacted the FBI Denver office to notify them of SALAH's presence in Colorado and of the situation with SALAH at the church in Roseville.  FBI Denver advised FBI Sacramento that they had just received a report of suspicious activity from the Arapahoe County Sheriff's Department regarding a Middle Eastern man at a local church on Sunday, November 19, 2023 – exactly one week after the incident at the church in Roseville.  The report was written by Officer Kevin Heaton and contained the following information:

    a.   "On November 19, 2023 at approximately 10:30 hrs. I was working extra duty at [the Greenwood Village, Colorado church] when advised of a suspicious male that had just walked out of the church wearing a red hat. As I walked toward the circle drive, I noticed a male wearing a red hat retrieving a black back pack from a light green Toyota Prius parked in the visitor area. The male put the back pack on his back and began to walk toward the main entrance. I greeted the subject, who did not initially appear concerned with my presence. He is described as: Middle Eastern Male, 5'7 - 5'9, medium build, dark colored beard Wearing black jacket, dark jeans, red hat with white circular logo, black back pack."

    b.   "As we returned to the main entrance the subject turned left and walked toward the bathrooms and choir area. As I approached the same area the subject came back around the corner and exited through the main entrance. I continued to monitor the subject who returned to his car and drove out of the parking lot westbound on Belleview Ave. I could not read license plate number which appeared to be from another state."

    c.   "Once I realized the subject had left, I notified the Director of Facilities, […], and recommended we check the bathrooms and areas the subject had walked toward prior to leaving. Nothing suspicious was found."

29.    Officer Heaton reviewed the church security cameras and noted the following:

a.  10:21 - Green Prius enters parking lot […] and drives through circle drive before parking in visitor area. (While viewing camera, image skips and can't read license plate. Unknown if it would skip when video is downloaded.)

b.  10:23:17 - Subject enters main entrance and walks into sanctuary. Subject appears to walk through sanctuary and out north entrance back into the lobby. Subject walks around lobby and back into the north sanctuary area before leaving.

c.  10:28:01 - Exits through main entrance toward parking lot.

d.  10:31:56 - Walks back into church and goes left toward restrooms, choir area.

e.  10:32:50 - Leaves church with backpack.

f.  10:34:20 Leaves parking lot

30.  Officer Heaton's report also stated that he took a picture with a cellphone of the church footage showing the subject's vehicle. That photo is below.  The officer could not read the license plate on the Prius but believed that it was from out of state:



AFFIDAVIT

31.     Officer Heaton's report also stated that his body-worn camera showed the subject wearing the backpack being greeted by him at 10:39 a.m.  A still shot from that camera footage is below.



32.     Based on my review of a driver's license photo and passport application containing SALAH's photo, the person in the body-worn camera still photo above is SALAH.

33.     Law enforcement database information showed that the Prius bearing license plate DSA8PD was located in Phoenix, Arizona the next day, November 20, 2023.

### E.     *Summary of Witness Interviews, Which Indicate That SALAH Carries a Firearm, Has Expressed Anti-American Sentiment, and Has Exhibited Behavior That Concerned His Neighbors*

34.     In an attempt to locate SALAH, agents from FBI, Phoenix visited his last known address on W. Eva Street in Glendale, Arizona, on November 17, 2023.  There, they encountered

Affidavit

the new owners of that residence, L.S. and A.R., who indicated that they purchased the property in August 2023. L.S. and A.R. provided the following information:

    a.   L.S. and A.R. recently moved into their home approximately August or September 2023. During the transition of the move, they had more than one interaction with the previous tenant, SALAH. L.S. and A.R. had to interact with SALAH while he retrieved his remaining items from the house so that they could paint the home. During one interaction, L.S. stated that SALAH would only talk to A.R. and would turn his back to L.S. Their realtor told L.S. that SALAH was a good guy and only behaved that way because of his religion. A.R. was wearing a hat with an American flag on it. SALAH commented on the hat and said that the USA was bad. A.R. challenged SALAH on this comment and told SALAH that you live in this country; why do you hate it? SALAH responded and said, "Fuck this country," and this country went over and killed many Iraqis.

    b.   On another day, SALAH was at the house getting items from the home while they were there. SALAH saw a cop car turn down the road near the home, and SALAH freaked out and ran inside until the cop car was out of sight.

    c.   During their interaction with SALAH, SALAH carried a gun in the small of his back. They also found ammunition in one of the rooms as they moved their items into the home. The round was believed to be a 9mm.

    d.   SALAH still had one vehicle that belonged to him at the home. A.R. texted SALAH in September to retrieve the car. The number A.R. had for SALAH was 480-522-0691. The last message A.R. sent to SALAH was on October 1, 2023. A.R. asked SALAH if he could retrieve the car. SALAH had not responded to that text message.

    35.    On November 18, 2023, your affiant contacted L.S. via telephone who provided the following information:

    a.   L.S. and A.R. bought the aforementioned residence in August 2023, from whom they believed was SALAH's mother.  They moved into the residence in September 2023.

They heard that SALAH's mother had moved back to Iraq where they were from.  L.S.'s neighbor told her that they never saw SALAH's mother at the residence, and that SALAH was the only one they saw living there.  L.S. stated that they originally made an offer on the home back in June or July 2023, but it was declined by the owner.  They heard from the real estate agent that the owner wanted to sell it to a family with kids.  L.S. and her husband put in another offer in July, and the owner took $5,000 off the price and accepted the offer.

b. SALAH had his things in storage at the residence, along with two vehicles. After L.S and A.R. moved in, SALAH still had not moved his stuff out of storage and left the two vehicles. When they contacted SALAH to request that he move his stuff out, he showed up at the residence and was really mad.  SALAH said he was mad because they took $5,000 off the price of the home and he thought he could just keep his stuff there because he had nowhere to put it.  During the conversation, SALAH turned his back to L.S. and would not address her because SALAH said she was a woman and it was forbidden in Islam. Around the same time, SALAH saw that A.R. was wearing a hat with an American flag on it.  SALAH asked A.R. if he liked the flag on his hat, which A.R. said he did because it's his country.  SALAH then said, "Fuck this country.  I hate America. This country went to Iraq and killed a lot of people."  A.R. tried to calm him down.  Three days later, SALAH showed up again at the residence and said sorry about his behavior on his previous visit.  At the same time he moved his body so that L.S. and A.R. could see that he had a handgun tucked into his pants at the small of his back.  L.S. believed he was trying to intimidate them.  SALAH took one car but left one at the residence.

c. The last time they saw SALAH at the residence, A.R. was washing one of his own vehicles.  SALAH expressed interest in buying the car and A.R. let him drive it down the street a few blocks.  SALAH came rushing back to the house, jumped out of the car, and ran into the house.  When they asked what he was doing, SALAH stated that he saw a police car and it was following him.  The car that A.R. let SALAH drive did not have

plates, but A.R. thought SALAH was acting very strange.  L.S. and A.R. found pistol ammunition in SALAH's old storage space at the residence, along with a pistol bullet in the clothing drying machine that came with the house.  One neighbor across the street told L.S. that they were all scared of SALAH because they had seen him with a gun before.  They also said that SALAH fought with neighbors because he hated their cats and dogs because of his religious beliefs.

d.  L.S. did not know if SALAH had a job or where he might be currently.  The last time they saw him was around August 2023.  The last time they talked to him was in late September, and he is not responding to their texts or calls.  The community Home Owners Association (HOA) management knows SALAH, and they seemed to think that he was a nice guy.  L.S. thought he might have lived there for around 15 years.  L.S. did not think SALAH had any serious mental health issues but that something seemed wrong with him because of his statements and behavior.  The house was also filled with mirrors, which she thought was part of his religious beliefs.  The second vehicle that SALAH left at the residence is a 1998 Toyota car.  Paperwork in the vehicle showed it was under the name of another individual with an address in Phoenix.

36.     On November 19, 2023, your affiant interviewed an individual via telephone who has been the HOA security and maintenance person for the community in which SALAH resided for many years in Glendale, Arizona.  This individual, hereinafter referred to as "C.A.," provided the following information about SALAH:

a.  C.A. stated that he has interacted with SALAH many times over the years.  C.A. said that SALAH has a real temper and did not like to follow HOA rules.  SALAH had a U-haul box truck for quite some time that he parked in the community RV storage lot.  It was a class B RV that is still parked in the aforementioned storage lot.[2]  SALAH told C.A. that he stored his tools in the U-Haul truck, but C.A. never actually saw what was in the truck.

_____

[2] This is a separate storage lot located in Glendale, Arizona, which is different from the storage unit in Colorado mentioned below.

AFFIDAVIT

C.A. stated that SALAH had three to six vehicles at the storage lot where he would do work on the cars, which was not allowed per the HOA rules.  SALAH would get upset with C.A. when he was confronted about having to move the cars off the storage lot. C.A. stated that SALAH bought and sold cars, and that he might have worked at a repair shop in the past.

b.  SALAH mentioned that he had an uncle and/or connections in California.  SALAH told C.A. that he had been in the US Army as an interpreter.  SALAH also told C.A. that he carried a gun.  He told one of C.A.'s friends not long ago that America gets what it deserves, like the COVID-19 pandemic, and that there would be more to come.  C.A. stated that SALAH went underground for a while last year and would never come out of his house. SALAH's mother used to walk around the neighborhood, but she went back to the Middle East for Ramadan.  It has been a few months since C.A. has seen SALAH. One night, one of SALAH's next-door neighbors noticed smoke outside, and when they looked to see where it was coming from, they saw SALAH burning papers on his side lawn.  When the neighbors asked SALAH if everything was all right, SALAH told them to "mind their own fucking business."  Around the same time he was seen burning papers, the neighbors also saw him paint one side of his vehicle and then remove the paint not long after.

c.  C.A. was not aware of SALAH having any siblings/family other than his mom, but he remembered SALAH mentioning that "his brothers" were upset with him when in the past one of his mother's mobile homes burned down. SALAH had made comments about being upset that his mother did not give him any money after selling the house in Glendale, AZ.  SALAH is known as a loner, and the last time C.A. was in contact with SALAH was September 21, 2023, using telephone number 480-522-0691.

37.    On November 19, 2023, your affiant interviewed one of SALAH's neighbors, hereinafter referred to as "T.D," via telephone.  T.D. provided the following information to law enforcement:

a. T.D. has lived in his current residence, about five houses away from SALAH, for ten years. SALAH went into hiding for about a year after SALAH's mother put the house up for sale in 2022. SALAH had been living in his mother's home for years.  T.D. stated that SALAH just stopped coming out of the house.  SALAH told T.D. that America deserved the COVID-19 pandemic.  T.D. told SALAH he better watch what he said.

b. SALAH's next-door neighbors told T.D. that when SALAH came out of hiding in his house, he started burning papers outside his house at an odd hour at night.  SALAH told the neighbors to mind their own business when they asked SALAH if everything was ok.

c. T.D. and other neighbors consider SALAH to be a sketchy, weird guy.  SALAH recently tried to give T.D. a pair of dress shoes for no apparent reason.  T.D. recently got a new pair of boots in the mail from an unknown sender.  T.D. stated that they could be from SALAH, but he does not know why he is trying to give him shoes.  T.D. stated that at one point he heard that SALAH had barricaded himself in his parked RV in the community RV storage lot, and that Glendale Police Department (PD) might have been involved in the incident.  Glendale PD knows of SALAH because SALAH had called them a lot to make complaints in the past.

d. SALAH's next-door neighbor witnessed SALAH burning papers in his lawn at night. T.D. also noticed around the same time SALAH was seen burning papers, that he randomly started painting one side of one of his vehicles, then he promptly removed the paint.  SALAH drives a green/yellow Toyota Prius, but the last time T.D. saw SALAH, he was driving a motorcycle wearing a black leather jacket and helmet.[3]  SALAH had recently complained to T.D. that his mother did not give him any money from the sale of her house that SALAH had also occupied.

---

[3] As discussed below, two motorcycles were observed by the FBI to be inside SALAH's residence on November 21, 2023. In addition, as discussed more fully below, on December 11, 2023, the Honorable John Z. Boyle, United States Magistrate Judge, District of Arizona, authorized a search of SALAH's residence located in Phoenix, Arizona. On December 12, 2023, your affiant witnessed two motorcycles in the residence and one motorcycle in the garage of the residence.

AFFIDAVIT

38.     According to a law enforcement database query, SALAH has a permit to carry a concealed weapon in Arizona.

39.     On December 8, 2023, your affiant conducted a follow-up interview with C.A. During the interview, C.A. provided the following information about SALAH:

a.  C.A. tried to avoid SALAH in the past because SALAH always flipped conversations and would get negative. Approximately five years ago, C.A. saw SALAH in a Home Depot check-out line. SALAH and C.A. talked for approximately 30-40 minutes after checking out of the store. During the conversation, SALAH stated that he was a Christian Muslim/Muslim Christian. C.A. did not know what he meant. SALAH flipped the conversation and began to say bad/negative things about Christianity and stated that Islam was the correct religion. C.A. did not know why SALAH was talking to him about those issues.

b.  Anytime SALAH saw C.A. in their neighborhood or in town, SALAH would talk to C.A. about Islam and he would put down Christianity. C.A. stated that SALAH was known as a loner, and C.A. recently heard one neighbor talk about SALAH possibly being [a member of] a sleeper cell because of his suspicious nature. C.A. thought that SALAH had travelled to Turkey at one point to find a wife, but C.A. did not think SALAH found one before returning to the United States.

c.  C.A. remembered that when SALAH and his mother moved into their community about ten years ago, SALAH's mother went on walks around the neighborhood wearing a hijab, and she would randomly tell people that they were Christian.  C.A. stated that it was strange she would randomly tell people that, and that she has traveled to the Middle East in the past to celebrate Ramadan. C.A. stated that SALAH's mother might have told people they were Christian to fit it to the community after arriving to the United States from Iraq. Neither SALAH nor his mother ever talked about going to Christian churches.

AFFIDAVIT

F.   *SALAH'S INTERVIEW ON NOVEMBER 21, 2023*

40.   Agents from the FBI field office eventually located SALAH at his Phoenix, Arizona residence ("Phoenix residence") on November 21, 2023.  SALAH agreed to speak with the agents and invited them into his residence. The interview was recorded.  I have reviewed that recording, and I have reviewed the interviewing agent's report of the interview, which I have summarized below.  During the interview, SALAH provided the following information:

a.   SALAH is an Iraqi, Kurdish, Sunni male from Northern Iraq who has been living in Arizona for approximately 20 years.  He was residing at the Phoenix residence with his mother.  SALAH's mother was not present and recently traveled back to Iraq to visit family in Slemani [Sulaymaniyah].  SALAH was unsure whether his mother would return to the United States.

b.   SALAH traveled to San Diego approximately a week prior to look for work.  SALAH applied for work at a body shop to work as a mechanic in El Cajon.  SALAH had also seriously considered moving to San Diego.  SALAH spoke with an individual named Kamil LNU (unknown spelling) at the auto shop in El Cajon.  SALAH did not have any other identifying information for Kamil.  While in El Cajon, SALAH prayed and washed his clothes at a mosque located at Broadway and 2nd street.

c.   Also, while in California, SALAH traveled to Sacramento to look for work.  SALAH was told that Sacramento had a large population of Iraqis, so he traveled there to look for work as a mechanic.  SALAH spoke with an individual named Wassam, LNU (last name unknown) ("Wassam") (unknown spelling) at the auto shop.  SALAH did not have any additional identifying information for Wassam.  SALAH applied for food stamps in both San Diego and Sacramento.  SALAH never received his food stamps.[4]

---

[4] On December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search SALAH's Prius and to affix a tracker. Photographs taken from the search of the Prius revealed an application for CalFRESH and CalWORKS dated November 8, 2023, in SALAH's name. The box asking if SALAH is homeless was checked "Yes". An appointment for an interview to obtain these benefits was set for November 27, 2023 in North Highlands, California.

d. While in Sacramento, SALAH met an individual named John LNU (John) at a gas station. SALAH and John went to a church together because John told SALAH that the church would have clothes that SALAH could take. SALAH stated that he was at the church for only two or three minutes. The church did not have any clothes for SALAH, and John told SALAH to maybe come back another week. SALAH did not have any additional identifying information for John and never saw John again.

e. SALAH was questioned by interviewing agents about a backpack that was left at the church. SALAH went to the church with the backpack and stated that he left with the backpack and did not leave a backpack at the Church. [Agent note: At this time, interviewing agents showed SALAH a photograph of the backpack tied to a toilet at the church in Roseville. Additionally, agents showed SALAH photographs of SALAH walking through the church in Sacramento.] SALAH said the backpack from the photograph was not his backpack and he did not leave a backpack in the bathroom. SALAH said he carried a blue and black backpack and that he carried the blue backpack while in the church in Sacramento. SALAH stated that the photograph of him at the church was not him and that interviewing agents could not be sure that the photo positively identified him. SALAH stated that he wore the color red every day while in California.

f. [Agent note: At this time, SALAH consented for agents to look through the backpacks in the room to see if any of the clothing matched the photo.] Agents did not find anything suspicious or derogatory inside the home. Agents did not find any matching clothing from the Sacramento incident.

g. At the time of the interview, SALAH had a Verizon phone and had the phone for approximately one month. SALAH stated the phone number was 480-689-3264. The number, however, was never confirmed because the phone was not active and SALAH stated that he had not paid the bill for the line.

h.  SALAH also traveled to Colorado on November 15, 2023, to look for work.  SALAH spoke with Abu Aya (Abu) (unknown spelling) who was renting a warehouse.  SALAH worked for Abu for two days but never received payment.  SALAH left the warehouse because Abu was cheating customers. SALAH had no additional identifying information for Abu.

i.  SALAH stated he never went to a church in Colorado.  SALAH was shown a photo of himself at the church in Colorado and agreed it was him.  SALAH asked agents if it was illegal to go to churches.

j.  SALAH was asked if he ever expressed hatred towards the United States or said "Fuck this Country."  SALAH denied this and said that anybody who knew him knew he had more respect for the United States and that he loved this Country.  SALAH expressed willingness to help and said he would call the police if he ever saw someone acting suspicious or looking to harm anyone.  SALAH was open to be contacted by agents again.

**G.    *EVIDENCE INDICATES THAT SALAH SWITCHED LICENSE PLATES AND WAS AGAIN TRAVELING***

41.    On November 22, 2023, one day after SALAH's interview with agents from the FBI Phoenix office, information obtained by the FBI from a law enforcement database indicated that, at 9:08 p.m., the license plate that was previously on the Prius was traveling in Glendale, Arizona, but a corresponding photograph showed that the license plate was now on a Toyota Land Cruiser**.**  Later that night, at approximately 10:00 p.m., the FBI obtained information from a law enforcement database indicating that the same license plate was 45 minutes south of Phoenix, Arizona.

42.    Vehicle records indicate that SALAH also has a Toyota Land Cruiser ("Land Cruiser") registered to him with license plate number RKA2DF.  To your affiant's knowledge, this license plate has not been detected by law enforcement since the Prius license plate was detected on the Land Cruiser on November 22, 2023.

43.     On November 24, 2023, agents from the FBI Phoenix office knocked at the door of SALAH's Phoenix residence.  No one answered, and the agents saw that there were no vehicles parked at the property.

44.     Based on my training, experience, and knowledge of this investigation, I believe that this evidence indicates that SALAH switched license plates on his vehicles in an attempt to evade law enforcement detection.  I further believe that the information above, including the license plate being detected 45 minutes south of Phoenix and the absence of SALAH and any vehicles at his residence, indicated that he was again traveling at that time.

### H.     *SALAH IS ARRESTED IN TEXAS AND FOUND TO BE IN POSSESSION OF A LOADED FIREARM, STOLEN LICENSE PLATES, AND ADDITIONAL EMPTY BAGS*

45.     On November 25, 2023, your affiant received a call from Texas State Trooper Esparza who advised that she had pulled SALAH over on Highway 10 near MP 185 in Davis County, Texas.  The following information is based on my conversations with the State Trooper and her subsequent report.[5]

a.  Trooper Esparza originally noticed an SUV following behind her patrol vehicle for approximately 20 minutes seemingly not wanting to pass her.  The SUV pulled into a rest area where it remained for approximately one hour.  Trooper Esparza circled back to obtain the license plate on the vehicle, which was Texas license plate SBM2647.   This license plate was associated with a Silver 2004 Isuzu, but the SUV to which it was affixed was clearly a Land Cruiser.[6]  Once the vehicle was traveling again, at approximately 10:13 a.m., Trooper Esparza initiated a traffic stop.

_____

[5] This information was provided verbally over the telephone as well as in a report sent to your affiant.

[6] On December 1, 2023, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to obtain and search the two cellular telephones that were found in SALAH's possession upon his arrest by San Diego Police, discussed more fully below. FBI review of one of these devices, SALAH's Apple iPhone 7 Plus, revealed that this device accessed the Wi-Fi in or about the same location as is believed that Texas license plate SBM2647 was last located in Dallas, Texas. Law enforcement database information shows that Texas license plate SBM2647 was located at or around a particular address in Dallas, Texas on or about November 15, 2023. The license plate appeared to be on a silver vehicle that was located in a marked parking space. On November 24, 2023, SALAH's Apple iPhone 7 Plus appeared to have accessed Wi-Fi on the same street as the above-referenced

AFFIDAVIT

b.  The driver provided Trooper Esparza with an Arizona driver's license identifying himself as Zimnako SALAH Salah.  Trooper Esparza asked SALAH for his registration and insurance, and he advised that he did not have either.  Trooper Esparza told SALAH that the license plate on his vehicle was not the plate that belonged to his vehicle and asked him where the Texas plate came from.  SALAH stated that he had to put his SUV in a mechanic's shop due to some issues and that the people there must have put the plate on the SUV.  Trooper Esparza also spoke with SALAH about his travels.  SALAH stated that he went to Dallas to find work, had applied for many different jobs including to work at Sprouts (a grocery store) but did not have any luck getting a job.[7]  Trooper Esparza asked if he knew anyone in the Dallas area, and he stated that he did not.  SALAH stated that he went to pray at the Mosque for only a few days.  SALAH stated that he started his travels to Dallas on Monday of that week but also stated that the current day was Sunday when it was actually Saturday.[8]  Trooper Esparza asked more about the SUV and why it had Texas plates on it and where the Arizona plates were located.  SALAH said that he could not say where the plates were at.

c.  Trooper Esparza asked SALAH for consent to search the Land Cruiser for any contraband inside the vehicle as far as weapons or illegal narcotics.  SALAH stated that Trooper Esparza could look, but he did not want her to touch his things out of respect.  SALAH showed Trooper Esparza a few bags that just had clothes and other bags inside of them. Trooper Esparza then told SALAH that because he was not allowing her to

---

address in Dallas, Texas at approximately 10:37 p.m. CST. Your affiant assesses that SALAH stole the plate from the silver vehicle mentioned above on that street. SALAH also appeared to have deleted this Wi-Fi location data from this device.

[7] FBI review of SALAH's Apple iPhone 7 Plus revealed a cached image accessed on November 24, 2023, of a screen shot of a confirmation of the receipt of a Sprouts Farmer's Market, LLC., Work Opportunity Tax Credit Questionnaire located at tcs.adp.com.

[8] As noted above, law enforcement database information showed that the Prius bearing license plate DSA8PD was located in Phoenix, Arizona on Monday, November 20, 2023, and SALAH was interviewed by FBI agents at the Phoenix residence on Tuesday, therefore, he was not traveling to Dallas on these dates. Law enforcement database information shows that SALAH began travel out of Phoenix, Arizona on Wednesday night, November 22, 2023.

AFFIDAVIT

touch the items, she would treat this as him refusing to permit her to search the Land Cruiser and its entire contents.

d.  Trooper Esparza told SALAH that she had a drug detection canine, which she would deploy for a free air sniff.  The narcotics detection canine alerted to an odor of narcotic emitting from the Land Cruiser**.**  Trooper Esparza, Trooper Britt Williams, Trooper Meagan McConnell, and Trooper Terrace Foster assisted in the traffic stop. The Land Cruiser was searched at approximately 11:53 a.m.  They found the following relevant items:

- A handgun under the driver's seat floor mat.  The gun was a CZ P-10 C (9x19) semiautomatic pistol, serial #G033124, which was loaded.  SALAH stated that he did not know the gun was in the car and thought he had left it at home.
- A firearm magazine with multiple rounds inside the pistol.
- Six to eight bags, including suitcases, duffle bags, and backpacks that SALAH said he had just bought at yard sales to use for storage.
- Three butane cannisters which appeared to Trooper Esparza not to have been used for travel grills.
- Four gas cans, two of which contained gasoline.
- One license plate numbered AZ 122VHT. The AZ 122VHT license plate was found under the front driver side seat with the loaded firearm.

e.  Trooper Esparza first called your affiant at approximately 12:44 p.m. I provided Trooper Esparza with a quick overview of SALAH's recent suspicious activities reported at a church in Roseville, California and in the Denver, Colorado area, as well as law enforcement database information about SALAH's movement and that SALAH had changed the license plates on the Land Cruiser on November 22, 2023. I asked Trooper Esparza to be on the lookout for any materials in SALAH's vehicle that could be used to make an explosive device, including anything that might be used to make a fake explosive device. Trooper Esparza asked SALAH what he used the gas cans for in his

AFFIDAVIT

vehicle. SALAH stated that he was not familiar with that part of Texas, and that he was not aware of where gas stations were, so he needed gas in the vehicle.

f.  Trooper Esparza also informed me that SALAH was in possession of four cellular phones.  These phones were a Nokia flip phone, a Nokia phone that SALAH said he used only for overseas travel, a white and pink iPhone [Apple iPhone 7 Plus] that SALAH said he only used to connect to Wi-Fi, and a second black/dark gray iPhone [Apple iPhone 8 Plus] that SALAH claimed was his mother's as discussed below.

g.  Trooper Esparza asked SALAH about the cell phones.  SALAH told Trooper Esparza that one of the phones was his mother's.  He agreed to provide consent to search three of the phones but not the phone that he had identified as his mother's.  SALAH claimed that he did not know the password to that phone; however, Trooper Esparza could see several notifications appear on the screen of the phone for various social media sites as she was speaking with SALAH.  SALAH eventually told Trooper Esparza that he used his mother's phone to view YouTube and social media.  SALAH also told Trooper Esparza that the phone number for that phone was 623-305-1336. When Trooper Esparza again asked SALAH about whether he knew the password to the phone he claimed to be his mother's, SALAH said he did not want to discuss the phone any further.  Consequently, Trooper Esparza ceased asking SALAH questions about that phone.

h.  Trooper Esparza reviewed the contents of the phones regarding which SALAH had provided consent to search.  She was unable to access the Nokia phone that SALAH said he only used for overseas travel.  The other two phones contained little data.  From her review of the other two phones, Trooper Esparza determined that the phone numbers associated with the phones are 279-226-5979 (the white and pink iPhone he claimed he used for Wi-Fi) and 480-689-3264 (the Nokia flip phone).[9]

---

[9] During a follow-up call with Trooper Esparza on November 30, 2023, she clarified that SALAH told Troopers that telephone number 279-226-5979 was associated with the white and pink iPhone. Troopers did not visually verify this information on the white and pink iPhone.

AFFIDAVIT

i.   SALAH was Mirandized at approximately 1:45 p.m. by Trooper Britt Williams.  SALAH continued to speak with the Troopers after being advised of his rights.  SALAH was placed under arrest and handcuffed at approximately 2:58 p.m.

j.   Trooper Esparza told SALAH that she would take him before a judge because his vehicle was not registered, did not have insurance, and was being operated with the wrong registration tags.  SALAH's vehicle was towed to a lot in Balmorhea, Texas because it was unregistered and operating on a public highway.  Trooper McConnell conducted a property inventory of the Land Cruiser before it was towed. Texas State Troopers typically conduct a vehicle inventory before a vehicle is being towed and did so here in part due to the specific nature of this incident.

k.   Trooper Esparza took photographs during the search, several of which are included below.

 







46.     Notably, SALAH appears to be wearing the same hat here that he was wearing when he visited the church in Colorado.

47.     Per Trooper Esparza, SALAH was taken before a judge that evening.  The judge issued SALAH a fine and released him.

48.     At approximately 9:12 p.m., an agent from the El Paso FBI office contacted the towing company that was in possession of the Land Cruiser.  The individual who answered the phone told the agent that SALAH had already picked up his vehicle.

### I.     SALAH'S RETURN TO PHOENIX USING ANOTHER LICENSE PLATE

49.     On the morning of November 26, 2023, law enforcement database information indicated that the Land Cruiser with license plate 122VHT was in Phoenix, Arizona at approximately 8:46 a.m.  Notably, this is the license plate that Trooper Esparza found in the Land Cruiser on November 25, 2023.  This was not the plate that was on SALAH's vehicle when Trooper Esparza stopped him.  Your affiant spoke with Trooper Esparza about the plates, and she stated that she seized the Texas plate that was on the vehicle when she stopped SALAH.

50.     When the FBI ran the Arizona plate with number 122VHT on November 27, 2023, vehicle records indicated that 122VHT was a removed plate and not associated with a vehicle.

### J.     SALAH IS LOCATED IN EL CAJON AND ARRESTED ON STATE CHARGES

51.     On November 27, 2023, the Honorable Allison Claire, United States Magistrate Judge, Eastern District of California, authorized a warrant to obtain precise location data from the cellular phone assigned call number 623-305-1336.  Pursuant to that warrant, on November 28, 2023, at approximately 8:21 a.m., the FBI obtained information indicating that SALAH was in the San Diego area.  Shortly after 8:21 a.m. on November 28, 2023, your affiant was in communication with FBI San Diego regarding SALAH and his whereabouts in the San Diego area.  I received the following information from FBI agents and Task Force Officers in San Diego who were conducting surveillance or otherwise assisting with this investigation:

AFFIDAVIT

a.   At 12:07 p.m., FBI San Diego initiated surveillance in El Cajon, California. Surveillance continued from approximately 12:07 p.m. to 8:25 p.m.  FBI agents identified SALAH's known light green Prius bearing Arizona license plate 122VHT at 12:30 p.m.  As noted above, Arizona license plate 122VHT had been identified by Texas State Trooper Esparza on a previous traffic stop of SALAH in Texas on November 25, 2023, after it was discovered during a vehicle search under the front driver seat of the Land Cruiser**.**

b.   At 2:51 p.m., agents saw SALAH's green Toyota Prius pull into a gas station.  At approximately 2:51 p.m., agents saw SALAH open the trunk and pull out a yellow item he filled with gasoline.  The yellow bucket appeared to hold three to five gallons of gasoline and was placed in the trunk.  At 2:54 p.m., SALAH was seen leaving the gas station.  At 3:04 p.m., the Prius arrived at an autobody repair shop, where SALAH exited his vehicle, retrieved a yellow gas can from the trunk and entered the business.  SALAH was observed by agents interacting with several unidentified males throughout the day at different locations, including at the autobody shop.

52.    Your affiant communicated with an FBI San Diego JTTF Task Force Officer (TFO) who through law enforcement database checks found that Arizona license plate 122VHT observed on the Prius was reported stolen in Arizona.  The TFO contacted the complainant in Arizona and confirmed that the reported plate 122VHT had been stolen from one of their vehicle's around the Thanksgiving week.  The first time SALAH was known to have license plate 122VHT was on November 25, 2023, after Texas State Trooper Esparza discovered it during her search of the Land Cruiser during a traffic stop in Texas.  On the morning of November 26, 2023, law enforcement database information indicated that the Land Cruiser bearing license plate 122VHT was in Phoenix, Arizona at approximately 8:46 a.m.  That is the last time the license plate was observed by law enforcement until SALAH was located driving the Prius bearing Arizona plate 122VHT in El Cajon, CA on November 28, 2023.

53.    I received the following information from FBI agents in San Diego who were conducting surveillance or otherwise assisting with this investigation:

a. At approximately 8:16 p.m., SALAH was pulled over in his Prius by San Diego Police near the intersection of Broadway and Ballantyne in El Cajon, CA for having a stolen license plate on the vehicle. SALAH was arrested without incident at approximately 8:18 p.m. Bomb technicians responded to render the vehicle safe and x-rayed multiple suspicious items, but did not find explosives. Upon a search of the vehicle for additional stolen items, officers discovered a handgun (make and model CZ P-10, serial number G033124) under the driver's side floor mat. A loaded magazine with 15 hollow point rounds was also located right next to the pistol. A record check showed the handgun registered to an individual Glendale, Arizona, not SALAH. Upon information received from the searching officers and photographs obtained from the search of the vehicle, I have determined that the firearm was the same firearm discovered during the November 25, 2023 traffic stop of SALAH by Texas State Trooper Esparza.

b. In addition to being arrested in violation of receiving/possession of stolen property, SALAH was also arrested for possession of a loaded gun, 25850 (C)(6) - PC - Carry loaded handgun: not registered owner, and 25850 (A) - PC - Carry loaded firearm on person/vehicle: public place. Additional items found, but not seized in the Prius included two yellow five-gallon plastic gas containers; one blue six-gallon plastic gas container; one small green propane canister; an Arizona traffic ticket dated 11/26/23 issued for displaying plate suspended for financial responsibility and no proof of insurance; a Waxahachie, Texas ticket dated 10/25/23 for speeding and no proof of insurance issued to Toyota Prius with Arizona license plate DSA8PD; a black suitcase; a duffle bag, documents containing Arabic writing; a small brown bag; a green cooler; an ammunition cannister; and two cellular telephones. A full inventory was not taken of all items found in the vehicle. The Arizona plate (122VHT), the gun, magazine with 15 rounds of ammunition were impounded at the San Diego Police Department evidence room.

c. Two cellular telephones were located on SALAH's person. San Diego Police found them when they searched SALAH, and they were seized upon officers finding them. These

AFFIDAVIT

1    were a black/dark gray iPhone and a white and pink iPhone. SALAH told law

2    enforcement that the white and pink iPhone was his mother's phone.[10]

3    d.  SALAH was arrested at approximately 8:18 p.m. He was transported by San Diego

4        Police to a Port of San Diego Harbor Police Station where he was processed, interviewed,

5        and then transported and booked into jail at San Diego Central Jail.[11] SALAH's cellular

6        telephones were inventoried as part of his personal property pursuant to his arrest by San

7        Diego Police and were transferred from the Harbor Police Station to the San Diego

8        County Sheriff's Department at the San Diego Central Jail, 1173 Front St., San Diego,

9        CA 92101. On December 1, 2023, the Honorable Karen S. Crawford, United States

10       Magistrate Judge, Southern District of California, authorized a warrant for the FBI to

11       obtain and search the two cellular telephones.

12   e.  SALAH was Mirandized by Port of San Diego Harbor Police FBI TFO Roberto Padilla

13       and consented to an interview. SALAH denied ever being arrested or placed in handcuffs

14       by law enforcement officers in the past, even though SALAH had been arrested on

15       November 25, 2023, by Texas State Troopers for traffic violations. SALAH stated that

16       he did not own or possess a firearm; however, after being shown a picture of the firearm

17       discovered in his vehicle by San Diego Police, SALAH stated that it was his weapon in

18       the photograph. SALAH stated that he was scared to say he had a gun, and that he bought

19       it from an Iraqi man who left the United States to Iraq. SALAH did not remember the

20       name of the individual he purchased the gun from.[12]

---

[10] As noted above, SALAH had told Trooper Esparza that the black/gray iPhone was his mother's phone.

[11] The Prius was impounded and taken to a tow yard in San Diego, CA where it currently remains. As noted below, the Prius is currently in San Diego Harbor Police Department custody at the tow yard. On December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search SALAH's Prius. Agents searched the Prius the following day.

[12] In the official report of SALAH's interview, SALAH stated that he bought the gun about three months ago in Arizona from an Iraqi guy that moved back to Iraq. SALAH believed the name of the person he purchased the gun from was Sam, AKA Salim.

AFFIDAVIT

f. SALAH denied meeting with people while in El Cajon on November 28, even though agents had observed him meeting with multiple unknown males before SALAH was arrested. When SALAH was asked why he had a stolen license plate on his vehicle, SALAH denied knowing that he had a stolen plate on his vehicle. SALAH stated that he had a friend named John (LNU) in Arizona who told him that he should take the license plates off his personally owned vehicles at night because people liked to steal license plates. SALAH stated that he must have taken his plates off his Prius at some point and put the wrong plate back on.

g. Regarding the white and pink iPhone, TFO Padilla told me that SALAH identified this device as his mother's phone, and that she had moved to Iraq.[13] SALAH provided the pin code and consented to have the white and pink iPhone searched by interviewing officers. FBI Special Agent Jonathan Mackay spent a few minutes looking through the phone, but SA Mackay did not see much on the phone. TFO Padilla did not notice any cellphone alerts on the device during the interview. SALAH stated that 623-305-1336 was his mother's cellular telephone number, however, neither law enforcement officer was able to confirm that 623-305-1336 was associated with the pink and white iPhone. TFO Padilla stated that at some point after the phones had been seized by San Diego Police, a San Diego Police officer called 623-305-1336 and saw one of SALAH's two iPhone's ringing, but TFO Padilla did not know which device it was that was ringing.

h. Agent Mackay told me that SALAH stated that one of the two cellphones on SALAH's person was his mother's phone. SALAH stated that his mother's cellphone number was 623-305-1336. Agent Mackay looked through the white and pink iPhone for approximately ten minutes after SALAH consented to the search. Agent Mackay took the phone off airplane mode and began looking through the phone. Agent Mackay looked through text messages, but only saw one text that appeared to include the word

---

[13] As noted above, Trooper Esparza reported that SALAH told her that the telephone number associated with the white and pink iPhone was 279-226-5979.

AFFIDAVIT

"mom" in the text.  Agent Mackay clicked on the Facebook application, but it only showed the welcome notification, indicating that there was no account set up on the application.  Agent Mackay checked the Safari internet application browser history, but it was blank, indicating there was no internet history.  Agent Mackay, based on his observation, stated that the phone appeared to be wiped or not really used.  SALAH stated that he used OfferUp, an application used to buy and sell things.  However, Agent Mackay did not observe the OfferUp application on the phone.

i.   Regarding the black/dark gray iPhone, TFO Padilla told me that SALAH stated that it was his personal phone.[14]  SALAH unlocked the phone and gave permission for agents to look through it.  Agents did not do so, therefore, they did not confirm the telephone number associated with this device.  TFO Padilla is unfamiliar with iPhones, so he asked SALAH to find the number on the phone himself, because SALAH had stated he did not remember the number.  SALAH unlocked the cellphone himself and told TFO Padilla that the phone number was 279-226-5979.[15]  TFO Padilla found $100 in a compartment on the back of the phone case.  TFO Padilla did not notice anything else about the phone, and he did not attempt to call the phone.

j.   Agent Mackay told me that he did not know where the phones were found during the search, and that he did not search through the black/dark gray iPhone during the interview even though SALAH provided consent.  Agent Mackay did not notice anything specific about the black/dark gray iPhone.

k.   In my training and experience, I know that individuals involved in criminal activity will provide conflicting information to law enforcement in an attempt to obfuscate criminal activities on their cellular telephone devices.

---

[14] As noted above, SALAH told Trooper Esparza that the black/dark gray iPhone was his mother's phone.

[15] FBI review of SALAH's white and pink Apple iPhone 7 Plus revealed that the latest phone number attributed to the device was 279-226-5979, so it appears SALAH purposefully gave TFO Padilla the wrong phone number for the black/dark gray device.

l.  On November 29, 2023, FBI San Diego agents interviewed both owners of the aforementioned autobody shop, where SALAH had been observed interacting with unidentified males on November 28, 2023.  One of the owners told agents that he had hired SALAH approximately four weeks ago to do basic mechanic work at the shop, and that after working for approximately four days, SALAH stopped showing up for work without any notice.  In the last couple days, SALAH randomly returned and stated he was ready to work again.  When SALAH returned, he told one of the owners that he previously had an emergency in Sacramento, which is why he unexpectedly had left work, and that now he is back to work.

m.  One owner told interviewing agents that SALAH was asked on November 28, 2023, as part of his job, to fill up a gas can with gasoline.  When the owner went to give SALAH a gas can, SALAH stated that he already had one in his Prius, and that he would use that.  SALAH then left to fill up the gas can and returned to the shop to use the gas for one of the vehicles he was working on.  SALAH had also been asked as part of his job to test drive cars that he was working on that day.

n.  The owner stated that SALAH seemed honest and worked diligently.  SALAH was known to sleep in his vehicle and had even parked in the parking lot of a restaurant in the San Diego area owned by a Christian Chaldean, who would do things to take care of him.[16]

o.  The owner received a telephone call from SALAH at approximately 5:30 a.m. on November 29, 2023, asking for help to get out of jail.  SALAH stated that he was arrested for having a gun.  One owner called the other owner to tell him what happened, and that SALAH needed help getting bail.  Both owners agreed not to get him bail, but one owner called an associate of SALAH's family in Virginia who knew SALAH's family, including SALAH's mother.  When they told SALAH's family associate about SALAH

---

[16] In the official report of the owner's interview, he stated that a majority of SALAH's friends were Christian Chaldean Iraqis, and he never heard him speak bad of Christians.

AFFIDAVIT

being arrested, the family associate stated that it was no surprise that SALAH was arrested, and that he had a history of making bad decisions, has had run-ins with authorities since a young age, and that he might have some mental instability.[17]

54.     San Diego Harbor Police FBI TFO Padilla provided the following information to your affiant:  SALAH appeared before a judge in San Diego on charges involving the firearm found in his vehicle and the stolen license plate on his vehicle.  The judge set SALAH's bail at $1,000,000.

55.     On December 1, 2023, the judge ruled that SALAH was not eligible for bail. On December 14, 2023, SALAH appeared in court for a preliminary hearing.  After the hearing, the judge determined SALAH to be a danger to the public if released and kept all charges as originally charged.  SALAH is currently detained and his jury trial is scheduled for February 15, 2024.

### K.     *SALAH LEFT A BACKPACK IN THE SANCTUARY OF A SCOTTSDALE, ARIZONA CHURCH IN SEPTEMBER 2023*

56.     On approximately November 30, 2023, FBI Sacramento was contacted by Arapahoe County Sheriff's Department Captain Kevin Heaton, who had received information that a Christian church in Scottsdale, Arizona had reached out to his department regarding an Information Bulletin highlighting the November 19, 2023 incident where SALAH was identified as acting suspiciously at the Christian church in Greenwood Village, Colorado.

57.     The church reported that on Sunday, September 24, 2023, an individual who appeared to be trying to conceal their identity entered the church, dropped a backpack off during the service, then left on a motorcycle.  The individual was dressed in all black with a black mask covering his face.  The backpack was left on the floor between the seats in the worship center. He then left and walked around the campus.  He appeared to be looking at all the entrances and exits to the property. He was captured on multiple surveillance cameras within the church.  He

---

[17] In the same official report mentioned above, the family associate told the owner that SALAH had mental issues and was aware that he had several run-ins with law enforcement while he lived in Arizona for a period of 20 years.

AFFIDAVIT

arrived on campus riding a motorcycle which he parked in the north parking lot apparently making sure it was out of camera view.  The backpack was searched by Scottsdale Police Department and contained various clothing items.  The motorcycle was a newer model white in color with a black luggage box on the rear.  The individual arrived at 10:22 a.m. and left at 10:41 a.m. Security was contacted when the backpack was found in the worship center.

58.     Screenshots of the surveillance videos provided by the church are below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





1        59.   The FBI took additional screen captures from the videos that were provided by

2   the church:





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





60.     The church also provided photographs of the backpack and its contents, which included what appears to be a pillow and clothing:

  

  

61.     On December 4, 2023, your affiant was contacted by FBI Special Agent Jacob Bailey, who had interviewed SALAH at his Phoenix residence, along with FBI Task Force Officer Steve Denney, on November 21, 2023.  SA Bailey stated that the day they interviewed SALAH, there were two motorcycles in SALAH's home.  TFO Denney saw one motorcycle that had a plate affixed and the other one did not appear to have a license plate.  TFO Denney conducted a database check of license plate KAA80M that was affixed to the motorcycle.  The

motorcycle came back as a 2020 Kawasaki registered to an individual identified herein as S.M. at an address in Phoenix, Arizona that was not SALAH's known residence.

62.     According to a law enforcement database check, the motorcycle with license plate KAA80M was observed driving near SALAH's residence on September 24, 2023, at approximately 9:53 a.m., the same day of the Scottsdale church's incident mentioned above.

63.     A law enforcement database photo of the motorcycle with license plate KAA80M captured on September 24, 2023 at approximately 9:53 a.m., within minutes of SALAH's home, is below.  Based on the appearance and license plate, TFO Denney believes this is the same motorcycle he observed in SALAH's Phoenix residence on November 21, 2023.[18]



64.     It is approximately 30 minutes from the location of the law enforcement database photo location above to the Scottsdale church.  From the time of the law enforcement database photo above at 9:53 a.m. on September 24, 2023, and the arrival of the motorcycle seen in the

---

[18] As discussed more fully below, on December 11, 2023, the Honorable John Z. Boyle, United States Magistrate Judge, District of Arizona, authorized a search of SALAH's residence in Phoenix, Arizona. On December 12, 2023, your affiant witnessed this same motorcycle bearing Arizona license plate KAA80M parked inside the residence.

AFFIDAVIT

Scottsdale church surveillance video at 10:22 a.m. on the same day, nearly 30 minutes had passed, the same time it would take to travel between the two locations according to an open source travel estimate.

65.     On December 6, 2023, SA Bailey interviewed S.M., the individual associated with the KAAB0M license plate seen affixed to the motorcycle.  S.M. stated that on August 28, 2023, SALAH contacted him on Facebook about the motorcycle which he posted for sale on Facebook Marketplace.  SALAH met S.M. in person to look at the motorcycle on the same day and provided a down payment to hold it.  SALAH then came back later the same day and paid the full $2,000 in cash for the motorcycle.  S.M. provided screenshots from the Facebook Marketplace messages between him and Facebook user, Zimnako Salah.  S.M. did not know SALAH before their interactions regarding the motorcycle sale.   I reviewed those screenshots and recognize the profile photo for SALAH's account to be SALAH.

66.     Law enforcement database information shows the Prius bearing license plate DSA8PD was seen in Glendale, Arizona and Phoenix, Arizona on September 23, 2023 and September 25, 2023.  To your affiant's knowledge, the Prius was not seen on Sunday, September 24, 2023, the date of the Scottsdale church incident.

67.     On December 18, 2023, FBI Special Agent Danielle Hines interviewed a member of the Scottsdale church security team, hereinafter referred to as "T.C." During the interview, T.C. provided the following information:

a.  T.C. arrived at the church after the backpack was found and initially searched.  Officer Rob Marienau and T.C. went through the backpack.  T.C. then began reviewing security footage from the church and back tracing the individual's movements through the campus.  T.C. notified Scottsdale Police Department about the incident and asked them to keep an eye out for the motorcycle in the footage.

b.  T.C. initially believed someone accidently left the backpack.  After reviewing the security footage, he believed it was intentionally left.  He believed the individual was doing "recon" work.  Based on T.C.'s observations from the footage, the individual

AFFIDAVIT

appeared to be looking for areas to leave things, looking for escape routes, target areas, and testing for reaction time from the staff.

c.   The individual wore all black and moved around the campus like he had been to the church before.  He dropped the backpack and quickly left.  T.C. believed it was a test run for a possible attack and/or possibly a bomb.

d.   Church security is now conducting random backpack searches because of the incident.

68.   On December 18, 2023, FBI Special Agent Hines interviewed another member of the Scottsdale church security team, hereinafter referred to as "D.S." During the interview, D.S. provided the following information:

a.   D.S. worked as a member of the security team for the Scottsdale church.  He heard a call over the radio about the backpack on September 24, 2023.  Officer Ashley Hassler from the Scottsdale Police Department, who was on duty at the church, lead D.S. to where the backpack was left in the sanctuary of the church.  Officer Hassler and D.S. took the backpack to the welcome desk just outside of the sanctuary.  Office Hassler put on gloves and checked to see what was inside the backpack.  Upon discovering the backpack contained clothing, it was then taken to the church's security office where it was fully searched by officers and church security personnel.

b.   Security personnel initially believed the backpack was left by a homeless individual.  Upon further inspection of the backpack, security personnel took notice that the backpack was new.  After further review of the incident, security and church personnel believed it was a "dry run" for something in the future.  They believed the backpack could have been a small bomb and there could be an attempt in the future.

c.   Security personnel was concerned over the incident and took the stance, "see something, say something." Security and church personnel are now more sensitive with backpacks and are being more watchful.

69.   Based on the September 24, 2023 surveillance photos of the motorcycle provided by the Scottsdale church, the law enforcement database photo of the motorcycle with license

AFFIDAVIT

plate KAA80M from September 24, 2023, the information provided by FBI Special Agent Bailey and TFO Denney regarding the motorcycle observed in SALAH's Phoenix residence with license plate KAA80M, the interview of the previous owner stating that he sold the motorcycle to SALAH on August 28, 2023, and the suspicious black backpack left inside the Scottsdale church, your affiant assesses that it was SALAH who drove the motorcycle to the Scottsdale church and left the black backpack in the sanctuary on September 24, 2023.

70. In addition, the law enforcement database photo of the motorcycle with KAA80M plates, and the Scottsdale church surveillance photo of a motorcycle driven by the individual who left the black backpack in the church, both from September 24, 2023, show that the frame, color, and parts of the motorcycles are very similar if not identical in both photos, including the luggage storage container above the rear of the motorcycles.  In both photos the rider/s also appears to be wearing black gloves, black boots, black pants, a black jacket, a dark colored helmet, and a black backpack.  The black backpack on the rider/s also appears to be very similar to the photos of the black backpack left in the church included above.

**L.** **LAW ENFORCEMENT SEIZES ADDITIONAL RELEVANT EVIDENCE UPON EXECUTION OF FEDERAL SEARCH WARRANT AT SALAH'S PHOENIX, ARIZONA RESIDENCE**

71. On December 11, 2023, the Honorable John Z. Boyle, United States Magistrate Judge, District of Arizona, authorized warrants for the FBI to search SALAH's residence located in Phoenix, Arizona, the 1999 Gold Toyota Land Cruiser, and the 2020 Kawasaki motorcycle.

72. On December 12, 2023, FBI Phoenix and your affiant served the search warrants and seized and/or observed the following items inside the residence and/or the vehicles (this is not a complete list):

- A 2020 Kawasaki motorcycle bearing Arizona license plate KAA80M found inside the residence living room.
- A black motorcycle helmet and black/red riding gloves from inside the motorcycle's rear storage compartment.
- A black backpack full of clothing items near the motorcycle.

AFFIDAVIT

1  • A bag of destroyed license plates that were cut into pieces.

2  • A folder containing multiple license plates not attached to vehicles.

3  • A bag containing a black hat that was cut into pieces.

4  • Wiring connected to a large battery and two unknown electrical devices.

5  • Multiple cellphones.

6  • A digital camera.

7  • A GPS device.

8  • A loaded pistol.

9  • Two additional motorcycles.

10  • A 1999 Gold Toyota Land Cruiser.

11  • ████████████████████████████████████████

12  ████████████████████

13  • Sermon notes from a church in La Mesa, California, dated October 22, 2023.

14      73.  The motorcycle observed in SALAH's living room bearing Arizona license plate

15  KAA80M appears to be the same motorcycle depicted in the law enforcement database photo

16  mentioned above from the morning of September 24, 2023.  The motorcycle and the helmet and

17  gloves worn by the individual that placed a black backpack inside the Scottsdale church on

18  September 24, 2023 resemble the motorcycle, helmet, and gloves found inside SALAH's

19  residence and the motorcycle's rear storage compartment.

20      74.  Based on the discovery of the destroyed license plates and a black hat that was cut

21  into pieces inside SALAH's residence and Land Cruiser, all of which were listed on Attachment

22  B of the search warrants, your affiant assesses that SALAH was attempting to hide/destroy

23  evidence involving his hoax activities at the Christian churches.  In addition, the black hat that

24  was cut up also appeared to have a short bill that resembled the same black hat worn in the

25  Roseville, California church incident.

26

27

28

AFFIDAVIT

### M.   LAW ENFORCEMENT DISCOVERS THAT SALAH VISITED ANOTHER CHURCH IN LA MESA, CALIFORNIA ON OCTOBER 22, 2023

75.   FBI agents reviewed the aforementioned sermon notes that were found within the residence and determined that they appeared to be from a Christian church in La Mesa, California based on the name of the pastor that was associated with the notes.  Based on this information, I contacted TFO Padilla and asked that FBI San Diego make an inquiry with the La Mesa church to determine if they had any recent suspicious incidents.

76.   TFO Padilla contacted your affiant on January 5, 2024, after interviewing a security guard at the La Mesa church.  The security staff reported that they remembered a suspicious individual matching SALAH's description on Sunday, October 22, 2023, the same date as the sermon notes.  The security guard stated that the individual was carrying a backpack and left with the backpack in a Prius with Arizona license plates.  The security member then provided the following screenshots taken from video surveillance footage at the church:[19]



---

[19] The church security guard stated that the church no longer has the video of the church surveillance footage, but because it was suspicious when this subject was there, they took screenshots and saved them.

AFFIDAVIT



77.     On January 5, 2024, TFO Padilla interviewed the Director of Security at the La Mesa church mentioned above.  During the interview, the Director of Security provided the following information:

a.  On Wednesday, October 11, 2023, the preschool Director saw a suspicious Middle Eastern male with a thin build walking around the church property.  She alerted a security officer who also described the subject as a Middle Eastern male, about 40 years old with a thin build.  The security officer trailed the subject and stayed with him until the subject left the property.

b.  A week later, on Sunday, October 22, 2023, at about 11:05 AM, the same subject was spotted by the kid's ministry staff when they opened the doors for people to check in their kids before the 11:15 AM service.  The subject approached the ministry lobby on the third floor without a child, which made the situation suspicious to church staff.  He was standing in line behind a family and when asked if he needed help, he said he was with the family standing in front of him.  Church staff talked to this family and confirmed the subject standing behind them was not with them.

c. The kid's ministry notified church security and told security to keep an eye on the subject. As the kid's ministry staff kept looking at the subject, he walked way.

d. An off-duty police officer working church security followed the suspicious subject and saw him entering the men's bathroom inside the church. Another security officer also walked into the bathroom because he needed to wash his hands and saw the suspicious subject duck into a bathroom stall. The subject was then followed into the church auditorium where he sat by himself. Soon after he sat down, the subject got up and walked out of the church. Another off-duty police officer working church security approached the subject near the front of the church and introduced himself.

e. The subject told the off-duty police officer that he was from a local church in El Cajon, and that a friend had told him to check out the La Mesa church.[20],[21] The subject walked away into the bathroom, and when he came out, he walked back towards the kid's ministry area. He walked down the stairs and down to the lower parking lot and got into a gold/silver colored, older model Prius. Security personnel were unsure but believed the Prius had an Arizona license plate but were not able to read it. The subject drove away quickly out of the parking lot and left the property.

78.    Law enforcement database information places SALAH's Toyota Prius with an Arizona license plate (DSA8PD) in El Cajon, California on October 19, 2023 at approximately

---

[20] On January 30, 2023, TFO Padilla interviewed the Director of Security and Pastoral Protection (Director) at the El Cajon church mentioned by the subject. The Director was not aware of SALAH or his Prius at their location in El Cajon. The Director stated that the church also had a smaller offsite campus in El Cajon with a Middle Eastern congregation. The Director provided TFO Padilla with information from someone who filled out a contact form at the church by the name of Salah Salah, along with a mobile number. The individual also listed themself as part of the Arab congregation. The Director did not know if this was SALAH, but only provided the information because of the potential name match. The church entered the information into their database on October 23, 2023, which did not mean the individual was there on that date, but only that it was the date it was entered into the church system. To date, the FBI is not aware of the mobile number being associated with SALAH.

[21] On January 31, 2023, TFO Padilla interviewed the Worship Leader of the Middle Eastern offsite campus mentioned above. The Worship Leader was shown a picture of SALAH and his Prius. The Worship Leader stated that he had not seen SALAH at the Arab congregation and did not remember seeing his vehicle in the parking lot. He stated that he was "100% sure" SALAH had not been at the Arab congregation church.

3:17 PM PDT.  The next instance that law enforcement database information places SALAH's Toyota Prius with an Arizona license plate is in Phoenix, Arizona on October 22, 2023 at approximately 7:26 PM PDT.[22]  The timestamp on the October 22, 2023 screenshot from the church is 11:05 AM PDT and that is sensible as Sunday church times at the La Mesa church are 8:00AM, 9:30AM, and 11:15AM.[23]  According to Google Maps, the travel time between the La Mesa church and Phoenix, Arizona is approximately five and one half to six hours.  This travel time is within the timeframe of 11:15 AM  PDT to 7:26:50 PM PDT.

79.     Based on previous review of video surveillance footage of SALAH as well as SALAH's previously documented activities at the Roseville, California church, the Greenwood Village, Colorado church, and the Scottsdale, Arizona church, I believe the individual at the La Mesa church on October 22, 2023 was SALAH.  As he did in the Roseville, California church incident and the Greenwood Village, Colorado church incident, SALAH immediately returned to Phoenix, Arizona after visiting the church.  An additional note of concern is that it appears SALAH was located within the children's building associated with the La Mesa church.  It is my understanding that the children's building is separate and apart from the main church building.[24]

80.     This represents the fourth Christian church that the FBI has identified wherein SALAH participated in a hoax or hoax-like suspicious activities.  Based on FBI interviews and a review of SALAH's Apple iPhone 7 Plus, SALAH is currently a practicing Muslim.

### N.     INFORMATION OBTAINED SHOWING THAT SALAH WAS RENTING A STORAGE UNIT IN COLORADO NEAR THE CHURCH HE VISITED THERE

81.     On December 12, 2023, the Honorable Michael S. Berg, United States Magistrate Judge, Southern District of California, authorized a warrant for the FBI to search SALAH's Prius and to affix a tracker.  Your affiant was not present for the search.

---

[22] At this time your affiant is not aware of any other dates or times that SALAH's Toyota Prius with an Arizona license plate was identified in law enforcement databases from October 19, 2023 to October 22, 2023.

[23] The timestamp on the photo showing 2:15 PM was from the church staff/volunteer who took the photo on their personal cellphone of the surveillance video screen.

[24] The FBI investigation of SALAH has not revealed that SALAH has children.

82.     On December 13, 2023, FBI San Diego and a Task Force Officer from the San Diego Harbor Police Department transported the Prius from the tow yard to the FBI San Diego office, where it was subsequently searched and a tracker was affixed.  The following items were seized and/or observed (this is not a complete list):

- Ball bearings and loose screws, bolts, and nails.
- Stevinson Toyota East, Aurora, Colorado documents dated November 17, 2023.
- A black hat.
- A black Nike hat.
- A Hawke & Co black puffy jacket.
- A black backpack.
- A document containing a billing history for a storage unit located in Denver, Colorado on East Warren Avenue.
- Hardy brand black gloves.
- A Dickies black jacket with an attached gray hood.

83.     Your affiant observed a photograph from the search of the Prius which showed a billing history bearing the title "ZIMNAKO SALAH SALAH […] Cube A26".  The name and address of the company that issued the statement was a storage business in Denver, Colorado.  The billing history included a report for November 15, 2023, showing that SALAH paid $340.29 cash on October 7, 2023 for Unit A26, which is a 12x30x8 foot unit.

84.     On December 14, 2023, your affiant called the storage business and spoke to E.H., the manager of the facility.  During the interview, E.H. provided the following information:

a. E.H. is the manager of the storage facility.  He is aware of Zimnako SALAH as a current customer who is renting cube A26, a 12x30 foot storage unit.  SALAH has a past due balance on his storage unit.

b. On November 18, 2023, E.H. personally came in contact with SALAH at the storage facility.  E.H. stated that there were several red flags with SALAH, such as SALAH breaking the storage facility policies.  There were two specific incidents that caused E.H.

AFFIDAVIT

concern.  E.H. did not want to go into specific details about the policy issues, but SALAH was about to be evicted from the business.  One problem was that SALAH appeared to stay overnight in his personal vehicle at the storage facility, which was not allowed.

c.  E.H. has observed SALAH driving a Toyota Prius that appeared to be gray/silver, but he was not completely sure about the color.  SALAH started renting the storage unit on October 7, 2023.  The license plate on the Prius appeared to be from Arizona.  E.H. observed a portion of the license plate number, which appeared to start with DSA.[25]

d.  E.H. has personal cellphone video of SALAH that he took on November 18, 2023, after there was an incident with SALAH breaking policy at the storage facility.  Aside from the Prius, SALAH was also seen on the business's surveillance cameras on a different date driving what appeared to be a Subaru Wagon or a Toyota Highlander with a hitch on the back towing a motorcycle.  E.H. was not certain about the make and model of the vehicle, but he knew it was SALAH based on the surveillance footage.  E.H. personally witnessed SALAH's Prius inside the storage unit on November 18, 2023, which is one day prior to the suspicious incident that occurred at the church in Greenwood Village, Colorado, as discussed previously.

85.    Your affiant conducted an open-source search to find the approximate distance between the storage unit and the Greenwood Village church.  It is approximately 5.6 miles and 18 minutes between both locations, according to open-source information.

86.    Based on a review of law enforcement database information, your affiant is not aware of any information indicating that SALAH has maintained employment and/or a residence in Colorado.  The FBI also does not have any information to suggest that SALAH has close family members who reside in Colorado, nor does he appear to have strong ties to Colorado.[26] Based on the facts involving the storage unit, your affiant assesses that the storage

[25] As mentioned above, SALAH's Prius is registered with Arizona license plate DSA8PD.

[26] During his interview on November 21, 2023, SALAH told FBI agents that he went to Colorado on November 15, 2023 to look for work. He stated that he worked for an individual named Abu Aya who was renting a warehouse. SALAH said he worked for Abu Aya for two

AFFIDAVIT

unit may have be used by SALAH as a staging and/or storage location for items involving his suspicious activities at the church in La Mesa, California on October 22, 2023,Greenwood Village, Colorado on November 19, 2023, and the previous hoax incidents at the Roseville, California church on November 12, 2023, and the Scottsdale church on September 24, 2023.

### O.   *SALAH'S STORAGE UNIT CONTAINED DESTRUCTIVE DEVICE COMPONENTS AND ANTISEMITIC LANGUAGE SPRAY PAINTED ON THE WALL*

87.     On December 27, 2023, the Honorable S. Kato Crews, United States Magistrate Judge, District of Colorado, authorized a warrant for the FBI to search the aforementioned storage unit in Denver, Colorado as part of an ongoing investigation involving the aforementioned federal criminal statutes.

88.     On December 28, 2023, FBI agents executed the search of the storage unit.  Your affiant was not present for the search.  Agents seized a red hat and a black hat during this search.

89.     On December 28, 2023, your affiant reviewed the search photos taken during the search of the storage unit and observed the following items (this is not a complete list):

- Red and white electrical wires modified with electrical tape and nails affixed to a battery.
- A black neoprene case with what appear to be electrical wires attached to it or near to it.
- Wire cutters lying on the floor next to the modified electrical wires.
- A strip of silver/gray duct tape with nails affixed to the adhesive side of the tape lying on top of a blanket.
- A receipt from a store lying next to the aforementioned duct tape with nails affixed.
- A second strip of duct tape with nails affixed to the adhesive side of the tape, lying on the floor next to the bed mat, with lose nails and at least one visible ball bearing surrounding it.
- A Coleman propane canister next to what appears to be an Islamic Koran near the head of the bed mat.  The propane canister had strips of what appear to be the same silver/gray

---

days but never received payment. SALAH said he left the warehouse because Abu Aya was cheating customers. The FBI has been unable to corroborate this information. SALAH also denied ever going to a church in Colorado and when he was shown a photograph of himself at the church, he agreed that it was him and asked if it was illegal to go to churches.

duct tape stuck to the canister, along with a white electrical wire protruding from the neck of the propane canister with electrical tape around the wire and port.

- Two additional propane canisters without electrical wires or tape affixed.
- A box of ignition coils lying on the floor next to the propane canisters.
- Kurdish Arabic words spray painted in large, black lettering on the wall of the storage unit.
- A plastic bag next to a packaged battery and an empty battery package on the floor.
- Plastic bags with what appear to be items inside of them lying on the floor.

90.    Based on your affiant's training and experience, I identified many of the aforementioned items in the photographs as evidence pertaining to hoax bombs and bombs, namely containers containing flammable substances, possible explosives, possible bombs, and bomb-making equipment or supplies.

91.    On December 28, 2023, your affiant confirmed that a Special Agent Bomb Technician (SABT) was not present during the execution of the search warrant.

92.    On December 28, 2023, your affiant contacted an FBI Sacramento SABT David Doh,[27] who also reviewed the search photos.  The SABT stated that the propane canister with the white electrical wire protruding near the port of the canister appeared to be modified, and that only SABTs should handle the canister.[28] The red and white electrical wire with the nails affixed to a battery appeared to be configured to conduct an electric current that could potentially be used as part of an explosive device and/or a hoax device.  The silver/gray duct tape with nails

---

[27] In 2021, SABT Doh attended the 240-hour FBI certified course on Hazardous Devices Basic Course in which he learned about explosives, explosives components, electric components, hazardous device designs and theories, fuses, and detonators, chemical components, use for weapons of mass destruction, destructive devices, and chemical weapons. He also learned how destructive devices are designed, built and designed to function. He also learned how to identify the components of destructive devices after an explosion and learned basic post blast investigations.  SABT Doh has participated in at least 12 different destructive device investigations that involved actual devices since he was certified in 2021.

[28] Agents executing the search initially assessed that the propane canisters were used to warm the unit.

AFFIDAVIT

affixed to the adhesive could be used as shrapnel on an explosive device and/or a hoax device. The SABT also noted that it was concerning that the nails appeared to be new. The SABT conducted an open-source search of the ignition coils, which showed that the coils are designed to produce the high voltage necessary to ignite an air/fuel mixture in a combustion chamber. Based on the description, the SABT assessed that there is the potential for the ignition coils to be modified and used in an explosive device. The SABT stated that based on the photographs and his training and experience, the combined parts in the photos appeared to be modified in order to potentially make an explosive device and/or a hoax device. The SABT stated that any future FBI search should include SABTs in order to further assess the materials/devices, and to ensure the safety of the storage facility and the search scene.

93.     On December 29, 2023, a certified FBI Kurdish Arabic linguist translated the spray-painted black Kurdish Arabic writing on the wall of the storage unit.[29] The FBI linguist stated the following: "The two words on top of each other on the right side says: Asshole [or: Fucking, or: Stupid] Jew[.] The two words on top of each other on the left side says: Allah… Muhammad[.]" The photos below include those observed by your affiant, which were taken by the search team photographer (these are not all of the photographs):



---

[29] A can of black spray-paint was found within SALAH's Toyota Prius during the FBI search of this vehicle on December 13, 2023.

AFFIDAVIT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16
17
18
19
20
21
22
23
24
25
26
27
28

**P.** *SECOND FEDERAL SEARCH WARRANT SERVED ON SALAH'S STORAGE UNIT*

94.     On January 17, 2024, the Honorable Scott T. Varholak, United States Magistrate Judge, District of Colorado, authorized a warrant for the FBI to conduct a second search of the aforementioned storage unit.

95.     On January 17, 2024, FBI agents executed the search of the storage unit.  Your affiant was present for the search, along with FBI SABTs.  The following items were seized:

- Duct tape with nails affixed.
- Duct tape.
- A used paper towel and tape.
- Red and white wires attached to a battery.
- A larger duct tape strip with nails affixed and a 9-volt battery.
- Nails, ball bearings, and nuts and bolts.
- A Battery and micro-USB cable.
- A box of seven Duralast ignition coils.
- Wire cutters.
- A Coleman propane tank with silver/gray duct tape stuck to the canister, along with a white electrical wire protruding from the neck of the propane canister with black electrical tape around the wire and port.
- A second Coleman propane tank.
- A yellow propane tank.

96.     SABTs x-rayed the Coleman propane tank with the white electrical wire mentioned above at the search scene.  SABT Doh assessed that the white electrical wire did not appear to go inside the tank, but it was wrapped around the neck of the canister near the port and taped down with electrical tape.  There did not appear to be any foreign substance inside the tank other than propane.  SABT Doh assessed that the electrical wire was likely not capable of igniting the propane tank with an electrical current based on the position of the wire.  SABT Doh assessed that the material in the storage unit mentioned above was likely being used for a hoax

bomb device or possibly being used to attempt to make a viable explosive device.  FBI Sacramento is sending the materials to the FBI Terrorist Explosive Device Analytic Center for further analysis.

97.    Based on the facts involving the storage unit, the FBI assesses that the storage unit may have been used by SALAH as a staging and/or storage location for items involved in his suspicious hoax-like activities at the churches in La Mesa, California on October 22, 2023 and Greenwood Village, Colorado on November 19, 2023, and the previous hoax incidents at the Roseville, California church on November 12, 2023, and the Scottsdale, Arizona church on September 24, 2023.

### Q.    SEARCH OF SALAH'S DIGITAL DEVICES TO DATE

98.    On December 1, 2023, the Honorable Karen S. Crawford, United States Magistrate Judge, Southern District of California, authorized search warrants for two cell phones seized from SALAH upon his arrest on the aforementioned state charges.

99.    Additionally, pursuant to the above-referenced search warrant issued in the District of Arizona, the FBI seized three cell phones from SALAH's residence.

100.    To date, the FBI has been able to access four of these devices and has found the following relevant information:

a.    Location data for SALAH leading up to his arrest.  The location data shows SALAH's last visits to Dallas, TX and El Cajon, CA in November 2023.

b.    Various cached images[30] which concern weapons, military, the current conflict in Israel, ISIS, Christianity and/or Judaism.  Your affiant has included some examples of these images below.

---

[30] Cached data is all the files, images, and scripts that are stored on an individual's digital device after the device visits a website. This makes reopening websites and applications much faster, which improves the user's online experience.

AFFIDAVIT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



AFFIDAVIT

» **Images**

Go to ▾

| Details | Events (0) |



Save

**Name:** https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgltQ%2Fframe0%2Ejpg_embedded_1.jpg

**Type:** Images

**Size (bytes):** 12897

**Path:** f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgltQ%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2Flk9DjXbgltQ%2Fframe0%2Ejpg_embedded_1.jpg

AFFIDAVIT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



» Images     Go to +

Details     Events (0)

Save

**Name:** https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FndKrlZshX_0%2Fframe0%2Ejpg_embedded_1.jpg

**Type:** Images

**Size (bytes):** 46872

**Path:** f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FndKrlZshX_0%2Fframe0%2Ejpg/https%3A%2F%2Fi%2Eytimg%2Ecom%2Fvi%2FndKrlZshX_0%2Fframe0%2Ejpg_embedded_1.jpg

---

» Images     Go to ▾

Details     Events (0)

Save

**Name:** https%3A%2F%2Flh3%2Egoogleusercontent%2Ecom%2F44HDrGXVjVwdVZHuUaVQwY75iN3hZhjX1siUCPwnVqxHv9rNzuI8pDBjw_OHc5eCunxs8R1ahRw1YuKX8Q_embedded_1.jpg

**Type:** Images

**Size (bytes):** 61345

**Path:** f0d6daf6296ee7664c549126cf8e289cb73ef876_files_full.zip/private/var/mobile/Containers/Data/Application/0CD70485-8E43-4EFB-9778-97388E651CB9/Library/Caches/com.pinterest.PINDiskCache.com.youtube.innertube.imageservice.cache/https%3A%2F%2Flh3%2Egoogleusercontent%2Ecom%2F44HDrGXVjVwdVZHuUaVQwY75iN3hZhjX1siUCPwnVqxHv9rNzuI8pDBjw_OHc5eCunxs8R1ahRw1YuKX8Q/https%3A%2F%2Flh3%

**R.   THE ROSEVILLE CHURCH IS USED IN INTERSTATE COMMERCE**

101.   Evidence indicating that the Christian church in Roseville is "real … property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce…" pursuant to section 844(i) is as follows.  The information about the church's practices below was provided by the church's pastor.

a.   The church has a collocated and co-owned private elementary school that charges students a fee to attend;

b.   The church maintains a cafeteria onsite where it charges its visitors for food and drink, including Coke products and name brand candy bars (M&Ms, Snickers etc).   The supplies for the cafeteria are ordered through Sysco, Peets coffee and local vendors.

- Your affiant reviewed Sysco's website, sysco.com, in which Sysco is described as "the global leader in selling, marketing and distributing food products to restaurants, healthcare and educational facilities, lodging establishments and other customers who prepare meals away from home.  Its family of products also includes equipment and supplies for the foodservice and hospitality industries.  With more than 72,000 colleagues, the company operates 334 distribution facilities worldwide and serves approximately 725,000 customer locations …"

- According to Peet's website, it is headquartered in California but has stores in Arizona, Colorado, Texas, Illinois, Michigan, Tennessee, Maryland, Virginia, Washington, D.C., and New York.

- According to its website, Coca-Cola is headquartered in Atlanta, Georgia and provides beverages around the world.  See coca-colacompany.com/about-us and coca-colacompany.com/careers/location

- Mars is the maker of M&Ms and Snickers and is headquartered in Virginia.  See craft.co/mars/locations

AFFIDAVIT

c.  Pens used by the church on weekends that are printed with the church's logo are shipped from China;

d.  Communion cups that the church uses weekly are shipped from Arizona;

e.  Many of the church's ministry supplies are ordered through Amazon which come from all over the country and outside the United States;

f.  Ministry supplies are also ordered through Concordia.  This includes battery operated candles for the church's Christmas services;

- A review of Concordia Supply's website indicates that they are a California company that provides supplies nationwide and that ships products from Kentucky (including candlelight), Indiana, Michigan, South Dakota, and California

g.  The church purchases Bibles through Zondervan international;

- According to Zondervan's website, it operates out of Michigan and its products are sold is more than 100 countries.

h.  The church routinely purchases food items from Costco, Smart and Final, and Sam's Club;

i.  The church purchases hundreds of t-shirts for volunteers several times a year, some of which are purchased from Cambodia or China;

j.  The church purchases and rents a lot of equipment though Illuminate Production Services

- According to Illuminate Production Services website at lightingips.com/contact, the company has offices in California and Florida and provides services nationwide.

k.  The church has seven campuses with over 200 employees and over 12,000 in attendance each week.  Two other campuses have cafes with similar vendors.

AFFIDAVIT

l.  The church hosts several large-scale conferences a year called Thrive Conference that have a global and local reach.  Several thousand attend in person but content is also streamed internationally.

m.  Regarding church employees, the church uses various programs that are based outside of California such as Paychex, Concur, Leadr, monday.com

- According to Paychex website, it is a publicly traded company that has clients in the United States and Europe.  See https://www.paychex.com/corporate

- According to its website, Concur is headquartered in Washington with offices worldwide. See https://www.concur.com/en-us/contact/offices

- According to its website, Leadr is headquartered in Texas

- According to its website, Monday.com is a publicly traded company with offices nationwide.  See https://monday.com/p/about/

n.  The church provides financial resources to AIM (Agape International Missions), registered in the United States, to combat sex trafficking overseas.

o.  The church raises funds and provide financial resources to Convoy of Hope who sends/uses their financial support for overseas needs/issues.  Convoy of Hope headquarters is in Springfield, Missouri.

p.  The church has provided relief to missions' organizations around the world in times of earthquakes, fires, and war.

## V.  <u>CONCLUSION</u>

98.     Based on the foregoing, there is probable cause to believe that SALAH committed a violation of 18 U.S.C. § 1038 (false information and hoaxes).  Consequently, I request that the Court issue the requested compliant and arrest warrant.

AFFIDAVIT

## VI.    <u>REQUEST FOR SEALING</u>

99.    I further request that the Court order that all papers in support of this application for a complaint, including this affidavit be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is not public.  While SALAH may be aware that, pursuant to a federal search warrant issued in the District of Arizona, the FBI searched his residence while he was detained on state charges, he is not aware of the full scope of the federal investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Jerid Hensley
Jerid Hensley
Special Agent
Federal Bureau of Investigation

Affidavit submitted by email/pdf and
attested to me as true and accurate by
telephone consistent with Fed.R.Crim.P 4.1
and 41(d)(3) this <u>15th</u> day of February 2024.

Hon. Jeremy D. Peterson
U.S. MAGISTRATE JUDGE

/s/ Angela L. Scott
Approved as to form by AUSA Angela L. Scott

AFFIDAVIT

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) *(Briefly describe the property to be searched or identify the person by name and address)* ) ) Black or dark green Nokia model TA-1400 cellular ) telephone, IMEI: 359952643817090 ) ) | Case No.   2:24-sw-0496 CSK |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-2, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____May 29, 2024_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for   30   days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   May 15, 2024 at 5:51 p.m.            _____
                                                              *Judge's signature*

City and state:      Sacramento, California            Hon. Chi Soo Kim, U.S. Magistrate Judge
                                                              *Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means  (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____        _____
Signature of Judge                                                          Date

1

2
## **ATTACHMENT A-2**

3
## **PROPERTY TO BE SEARCH**

4
The property to be searched is a black or dark green Nokia model TA-1400 cellular telephone,

5
IMEI: 359952643817090, which is currently located at 2001 Freedom Way, Roseville, California.

6

7
This warrant authorizes the forensic examination of this device for the purpose of identifying the

8
electronically stored information described in Attachment B.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>ATTACHMENT B</u>**

**PARTICULAR ITEMS TO BE SEIZED**

1.   The following evidence to be searched for and seized pertains to violations of 18 U.S.C. § 247(a)(2) (Obstruction of persons in the free exercise of religious beliefs) and 18 U.S.C. § 1038 (Hoaxes):

    a.   Communications, records, information, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

        i.   involving or indicating threats to commit acts of violence, including bomb threats and hoax bomb threats;

        ii.   involving acts of violence;

        iii.   pertaining to possessing or manufacturing explosives, bombs or bomb-making equipment or supplies, including butane, gasoline or any other flammable substance;

        iv.   pertaining to the possession of firearms;

        v.   pertaining to churches in Roseville, California; La Mesa, California; Greenwood Village, Colorado; Scottsdale, Arizona; or any other churches as yet unknown;

        vi.   pertaining to the possession of the following articles of clothing or accessories:  a black backpack, a light blue polo shirt with a darker-colored collar, a grey or black hat, a red hat, and a black "puffy" jacket;

        vii.   pertaining to any license plate;

        viii.   indicating any motive to threaten or harm individuals affiliated with any religion;

        ix.   pertaining to any storage facility or unit;

        x.   tending to identify other facilities, storage devices, or services (such as email addresses, IP addresses, phone numbers) that may contain electronic evidence concerning acts of violence or threats to commit acts of violence, including bomb threats and hoax bomb threats;

        xi.   tending to identify co-conspirators, criminal associates, or others involved in efforts to commit, or to threaten to commit, acts of violence, including bomb threats and hoax bomb threats;

      xii.   tending to identify travel to or presence at locations involving acts of violence or threats to commit acts of violence, including bomb threats and hoax bomb threats and/or tending to identify or exclude travel to or presence at locations described by Zimnako SALAH in post-arrest statements;

      xiii.   all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls potentially utilized by SALAH;

      xiv.   tending to identify the user of, or persons with control over or access to, the subject phones, including logs, registry entries, saved user names and passwords, documents, and browsing history, to include bookmarked sites;

      xv.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above; or

      xvi.   tending to establish whether communications were deleted, to include date and time of deletion;

b.   Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses that pertain to any of the following:

      i.   threats to commit acts of violence, including bomb threats and hoax bomb threats;

      ii.   acts of violence;

      iii.   explosives, bombs or bomb-making equipment or supplies, including butane, gasoline or any other flammable substance;

      iv.   churches in Roseville, California; La Mesa, California; Greenwood Village, Colorado; Scottsdale, Arizona; or any other churches as yet unknown;

      v.   indicating any motive to threaten or harm individuals affiliated with any religion;

      vi.   pertaining to any storage facility or unit;

2.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.